# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHELLE CHAMBERS, | No. 53003-1-II |
| Appellant, | |
| v. | |
| RODDA PAINT COMPANY, | UNPUBLISHED OPINION |
| Respondents. | |

MELNICK, J. — Michelle Chambers appeals the trial court's dismissal on summary judgment of claims for hostile workplace based on sexual harassment, outrage, and wrongful termination in violation of public policy against her former employer, Rodda Paint Company. She claims that the court erred in dismissing her claims for hostile workplace and outrage because she presented sufficient evidence showing genuine issues of material fact exist. She contends that the court erred in dismissing her claim for wrongful termination because she showed that her sexual harassment complaint to human resources (HR) was a substantial factor in Rodda's decision to terminate her employment and Rodda did not meet its burden of establishing a non-retaliatory motive. We affirm.

## FACTS

Chambers began working at Rodda in 2001. She subsequently became the manager of Rodda's Lacey store. In April 2015, Stan Osborne became Rodda's district manager, and Chambers' supervisor. During the times relevant to this case, the Lacey store had another female employee, Melanie Heatherington.

Rodda audits its stores twice a year to evaluate "the store and management quality covering leadership, organization, administration, inventory control, merchandising and housekeeping." Clerk's Papers (CP) at 77. Managers of stores who achieve a passing audit score of 90 percent or higher are given an additional monetary bonus. Chambers received these bonuses in 2013, 2014, and 2016. In the October 2015 audit, Osborne gave the Lacey Store a "failing" score of 72.5. Seven of the nine Rodda stores in the region failed the October 2015 audit.

In January 2016, Chambers sent Heatherington and a male employee to deliver a large quantity of paint. Osborne and Chambers discussed the delivery and Osborne told Chambers something to the effect of, Heatherington "is not built to be making large deliveries," or "not equipped to make deliveries." CP at 154, 298. Chambers told Osborne that Heatherington was not making the delivery alone, and asked Osborne if he preferred that she completed the deliveries. He did not respond. Chambers understood this lack of response to mean that Osborne did not want female employees making deliveries because women were not capable. The same day, Chambers called Rodda's HR representative, Jennie Wine, to report the comment.

At some point, a regional manager for Rodda investigated Chambers' complaint. Osborne denied making the comment.

According to Heatherington, Chambers told her that Osborne asked that she "not take control" of the big delivery because Osborne felt it was "demasculinating" [sic] to Heatherington's male coworker. CP at 354.[1]

The day after Chambers reported the comment, Osborne entered the Lacey store and told Chambers he hoped she had good insurance because he hit her car in the parking lot. Osborne then

---

[1] It is unclear from the record whether Chambers told Heatherington that Osborne actually said it was "demasculating" or whether Chambers merely perceived Osborne's "not equipped" comment to mean Heatherington's male coworker was being emasculated.

led Chambers outside to show her he did not actually hit her car. Upon returning inside, Osborne jokingly asked Heatherington whether she was ready to take over the manager position because Chambers had punched him in the parking lot. Chambers admitted that the incident was not gender-based. She did not inform HR about this interaction.

In March 2016, Osborne told Chambers not to look at women's job applications because "he has enough hormones in his district." CP at 299. Chambers does not claim, and the record does not show, that she reported this comment to HR.

Approximately ten days later, Chambers told Osborne that a Black job applicant passed his background check, to which Osborne replied "so, [D]jango can start soon huh?" CP at 299.[2] Chambers did not recall whether or not she reported the comment to HR. Wine stated that Chambers did not report the comment to her.

In October 2016, Osborne gave Chambers a failing score on a "Store Management Performance Review" which evaluated Chambers' leadership and management of employees and identified goals for improvement. The review's comments stated that Chambers needed to "organize the variety of personalities in [her] Team and synchronize them and ensure that everyone is delivering the required performance/results." Also, she needed to learn "[s]tructure and discipline" and then "coach, train and hold [employees] accountable." CP at 76.

In February 2017, Osborne asked Ken Reberry, a regional salesperson who worked with Chambers, to write him an e-mail providing his opinions on Chambers' management style. Reberry stated that Chambers' management style lacked the "heart, desire, and drive" of a leader, and that she had a "lack of motivation." CP at 387. He later explained that he is a workaholic and

---

[2] Django refers to a character, an enslaved person, in the movie "Django Unchained."

his critique of Chambers' management style stemmed from the fact that she did not work overtime, not her ability to manage a store.

On February 3, 2017, Osborne forwarded Reberry's e-mail to Wine, saying "We continue to see areas of lingering disappointing developments and will be delivering a performance improvement plan. . . . This was my store manager that was identified at the growth/strategy meeting in October for replacement. . . . I'm afraid it's time to coach this one out." CP at 386.

A couple of weeks later, Osborne and Chambers discussed a plan to "manag[e] the financial aspects . . . and improve the coaching and management . . . at [the Lacey store]. CP at 377. Osborne told Chambers that he was told to give her a 90-day performance improvement plan.[3] He decided not to because Chambers discovered that a freight company had over charged the Lacey store $5,000. Chambers believed that Osborne was threatening her job. A performance improvement plan is intended to improve the performance of an employee who "consistently fails to meet job factor expectations." CP at 228.

In March, two separate incidents occurred where Heatherington made comments to Osborne that annoyed him. After the first comment, Osborne said to Heatherington "I could punch you in the face." CP at 353. Chambers believed that this comment was not "gender related," and she did not report it to HR. CP at 432-34. After the second comment, Osborne yelled at Heatherington about making unprofessional remarks. Shortly after, Heatherington transferred to the Chehalis Rodda store.

Later in March, Osborne gave Chambers the 90-day performance review. It began with a breakdown of the Lacey store's net income, which is what the store made after expenses were

_____

[3] This document is referred to both as a "performance improvement plan" and a "90-day store-action plan."

subtracted from gross profits. Those figures varied between negative $60,000 and negative $45,000 in 2013, 2015, and 2016. Even though the store's sales increased, overall, the store lost money.

The review detailed eight "action items" that Rodda expected Chambers to implement over the next 90 days. They included steps to improve employee training and team building and to increase financial gains. It stated in part "We are pleased with the sales increases that are posting for the first two months of 2017. It is Imperative that we manage the expense and net income lines" and "Let's work together Michelle, and position you to accomplish at a minimum your Net Income Budget, and . . . get [the Lacey store] in a profitable condition sooner than later." CP at 110-11. At some point while discussing the review, Osborne told Chambers that if he wanted to fire her, he would find a reason to do so.

The Lacey store's operating statements for January through April 2017 showed a 32.05 percent gross profit increase when comparing January 2016 and January 2017. The operating statement also showed a negative 8.28 percent decrease in the year-to-date gross profit between 2016 and 2017. The Lacey store's turnover rate of employees in 2016 was 139.5 percent, significantly higher than the other sores in the region. The Lacey store had no employee turnover between January and April of 2017.

Between 2016 and 2017, Osborne made at least two comments to Rodda employees at the Lacey store that he chose not to hire Chambers several years earlier when he worked for a different retailer.

On May 16, 2017, Osborne gave the Lacey store 43 points, a failing score on an audit. CP at 112-132. That same day, Osborne asked Chambers to take a demotion to assistant manager.[4]

---

[4] Rodda agrees that Chambers and Osborne "discussed a demotion" on May 17.

The next day Osborne told Chambers that she either had to take the demotion or be let go. Three weeks later, Osborne asked Chambers to come into the store to discuss her 90-day performance improvement plan. Wine and Osborne terminated Chambers' employment at the meeting.

Two days after her termination, a Rodda customer told Chambers that Osborne's supervisor, Brian Villa, told him that because of her last two audits, Rodda let her go. In a June 15 letter to the Washington State Employment Security Department, Rodda reported that it terminated Chambers' employment because, "[a]fter prior warnings she failed to follow the directions given to achieve the goals set. She did not make acceptable progress in spite of substantial experience and a clear plan." CP at 349.

Five days later, Wine wrote a letter to Chambers and stated that Chambers termination resulted from "poor performance of store's operations and financial outcome. Through the application of a performance improvement plan, with the employee's length of service in the industry, unfavorable progress and results were made by the employee leading Management to an increased lack of confidence in employee's ability and willingness to improve the business." CP at 343.

Approximately two weeks after her termination, Chambers filed suit against Rodda. She claimed that Osborne's sexual harassment created a hostile work environment, that Osborne's actions constituted intentional infliction of emotional distress (outrage), and that her termination violated public policy because she complained to HR about Osborne's discriminatory comment.

In a deposition, Chambers stated that she believed Osborne's inappropriate or outrageous conduct constituted sexual harassment. She specified that she considered the "not equipped" and the "enough hormones" comments to be sexual harassment or sexual discrimination. RP at 154. Chambers stated no other conduct personal to her constituted sexual harassment; however,

6

Chambers said Osborne did harass one of her co-workers, but it did not factor into her believing she had been subjected to sexual harassment.

The trial court granted Rodda's summary judgment motion and Chambers appeals.

ANALYSIS

Summary judgment is proper "only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014); *see also* CR 56(c). There is a genuine issue of material fact if "'reasonable minds could differ on the facts controlling the outcome of the litigation." *Knight v. Dep't of Labor & Indus.*, 181 Wn. App. 788, 795, 321 P.3d 1275 (2014) (quoting *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)). We consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We review de novo a trial court's grant of summary judgment. *Collins*, 184 Wn.2d at 370.

The moving party's initial burden on summary judgment is to show the absence of a genuine issue of material fact. If that burden is met, the nonmoving party must establish a prima facie case. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 395, 823 P.2d 499 (1992).

I.  HOSTILE WORKPLACE CLAIM

Chambers argues that the court erred in granting summary judgment to Rodda on her hostile workplace claim based on sexual harassment because she presented a prima facie case. We disagree.

Washington's law against discrimination (WLAD), chapter 49.60 RCW, protects employees from sexual harassment. *Coville v. Cobarc Servs., Inc.*, 73 Wn. App. 433, 438, 869 P.2d 1103 (1994). RCW 49.60.030(1)(a) provides that the "[t]he right to be free from

7

discrimination because of . . . sex . . . shall include, but not be limited to . . . [t]he right to obtain and hold employment without discrimination." This right includes the right not to be subjected to sexual harassment. *Glasgow v. Georgia-Pac. Corp*., 103 Wn.2d 401, 405, 693 P.2d 708 (1985).

Sexual harassment claims are characterized as either "'quid pro quo harassment'" or "'hostile work environment'" claims. *DeWater v. State*, 130 Wn.2d 128, 134, 921 P.2d 1059 (1996) (quoting *Payne v. Children's Home Soc'y of Wash., Inc*., 77 Wn. App. 507, 511 n.2, 892 P.2d 1102 (1995)).

To establish a prima facie case for a hostile work environment claim, the employee must show that the harassment: (1) was unwelcome and offensive; (2) the conduct was because of sex; (3) the conduct was sufficiently pervasive that it altered the terms or conditions of employment and created an abusive working environment; and (4) the conduct is imputable to the employer. *Glasgow*, 103 Wn.2d at 406-07.

To determine whether harassment occurs "because of sex," the determinative question is, "would the employee have been singled out and caused to suffer the harassment if the employee had been of a different sex?" *Glasgow*, 103 Wn.2d at 406. Gender must be the "motivating factor" for the unlawful discrimination. *Payne*, 77 Wn. App. at 514.

To determine if the conduct is sufficiently pervasive, courts look to the totality of the circumstances, considering factors like "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *MacDonald v. Korum Ford*, 80 Wn. App. 877, 885, 912 P.2d 1052 (1996) (quoting *Harris v. Forklift Sys. Inc*., 510 U.S. 17, 20, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993)).

Summary judgment dismissal of the plaintiff's claims is appropriate if the plaintiff's submissions demonstrate nothing more than "[c]asual, isolated or trivial manifestations of a discriminatory environment [that] do not affect the terms and conditions of employment to a sufficiently significant degree to violate the law." *Glasgow*, 103 Wn.2d at 406

Harassment is imputed to an employer in one of two ways. It can be imputed to the employer if the harasser is an owner, partner, corporate officer, or manager. *Glasgow*, 103 Wn.2d at 407. Harassment can also be imputed to the employer if the harasser is the plaintiff's supervisor or co-worker if the employer "authorized, knew, or should have known of the harassment and . . . failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407.

In a deposition, Chambers stated that she considered only the "not equipped" comment and the "enough hormones" comment to be the sole bases for her hostile workplace claim. RP at 154. She stated no other conduct personal to her constituted sexual harassment. Chambers added that Osborne did harass one of her co-workers but that did not factor into her believing she had been subjected to sexual harassment. These two comments do not rise to the level of discrimination so "sufficiently pervasive [that it] . . . created an abusive working environment." *Glasgow*, 103 Wn.2d at 406.

Furthermore, to impute Osborne's comments to Rodda, Chambers must show that Rodda "authorized, knew, or should have known of the harassment and . . . failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407. The evidence is clear that Chambers only reported the "not equipped" comment to Rodda's HR. Therefore, any other evidence of Osborne's behavior besides the "not equipped" comment, cannot support a claim for hostile work environment.

Because Chambers is unable to establish a prima facie case, the court properly granted summary judgment to Rodda.

II.    VIOLATION OF PUBLIC POLICY

Chambers argues that the court erred in granting summary judgment to Rodda on the claim of wrongful termination in violation of public policy because she showed that her complaint to HR was a substantial factor in her dismissal.  We disagree.

In *Thompson v. St. Regis Paper Co.*, the Supreme Court adopted the tort of wrongful discharge in violation of public policy as a narrow exception to the at-will doctrine.[5]  102 Wn.2d 219, 232-33, 685 P.2d 1081 (1984).  Generally, wrongful discharge claims are limited to four categories:

> "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing."

*Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018) (quoting *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996)).  Chambers alleges her claim of wrongful termination in violation of public policy relates to her role as a whistleblower.

To prevail, the plaintiff first has the burden to show that his or her "'discharge may have been motivated by reasons that contravene a clear mandate of public policy.'"  *Martin*, 191 Wn.2d at 725 (quoting *Thompson*, 102 Wn.2d at 232).  To meet this burden, a plaintiff may rely on circumstantial evidence.  *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991).  "'The question of what constitutes a clear mandate of public policy is one of law' and can be established by prior judicial decisions or constitutional, statutory, or regulatory provisions or

---

[5] There is no dispute that Chambers was an at-will employee.

schemes." *Martin*, 191 Wn.2d at 725 (quoting *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989).

Then, the burden shifts to the employer to "articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Wilmot*, 118 Wn.2d at 70. This burden is one of production, not persuasion. *Wilmot*, 118 Wn.2d at 70 ("The employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden.").

If the employer articulates a legitimate reason, the burden shifts back to the employee either to show "that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker." *Wilmot*, 118 Wn.2d at 73. The employee "need not attempt to prove the employer's sole motivation was retaliation." *Wilmot*, 118 Wn.2d at 70.

Generally, an employee can show pretext by showing "'that the reason has no basis in fact, it was not really a motivating factor for the decision [or] it lacks a temporal connection to the decision or was not a motivating factor in employment decisions for other employees in the same circumstances.'" *Scrivener*, 181 Wn.2d at 447-48 (quoting *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 738-39, 904 P.2d 793 (1995)).

In establishing a prima facie case, "[p]roximity in time between the claim and the firing is a typical beginning point, coupled with evidence of satisfactory work performance and supervisory evaluations. Evidence of an actual pattern of retaliatory conduct is, of course, very persuasive." *Wilmot*, 118 Wn.2d at 69 (quoting 1 L. Larson, *Unjust Dismissal* § 6.05[1], at 6–51 (1988)). "Discharge some length of time after the employee's filing of a claim will be less likely to reflect an improper motive connected with that claim." *Wilmot*, 118 Wn.2d at 69.

The WLAD states that practices of discrimination because of sex are a matter of state concern. RCW 49.60.010. Complaining about discriminatory conduct is statutorily protected activity. RCW 49.60.210; *Estevez v. Faculty Club of Univ. of Wash.*, 129 Wn. App. 774, 799, 120 P.3d 579 (2005).

Chambers has the burden to show that her discharge may have been motivated by reasons that contravene a clear mandate of public policy. *Martin*, 191 Wn.2d at 725. There is a "clearly articulated public policy against sex discrimination in employment," which includes the right not to be subjected to sexual harassment. *Roberts v. Dudley*, 140 Wn.2d 58, 77, 993 P.2d 901 (2000); *Glasgow*, 103 Wn.2d at 405. In *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 570, 459 P.3d 371 (2020), we recognized a clear mandate of public policy for the purposes of wrongful termination when an employee is terminated in retaliation for making a discrimination claim under WLAD. Chambers has met her initial burden.

However, Chambers cannot meet the burden to show that her public policy-linked conduct was a substantial factor in the decision to terminate her. To show causation, she argues that Osborne "verbally expressed interest in relieving [her] of her employment literally the day after [she] filed her report." Br. of Appellant at 24 (emphasis omitted). She references the incident where Osborne "jokingly" told Heatherington she should be ready to take over the management position because Chambers had punched him in the parking lot. This incident occurred the day after she reported the "not equipped for it" comment to HR. CP at 299.

Chambers asserts that the "suggestion" that her job was at risk "increased in intensity and seriousness, including being communicated behind [her] back to her employees." Br. of Appellant at 24. However, Chambers neither cites to the record nor states what communications Osborne

12

made "behind her back." She also fails to specify the evidence that shows "suggestions" made by Osborne that her job was at risk.

Chambers next asserts that the evidence "shows an increase in micromanagement, hostility, and removal of job responsibilities, amidst profanity laced outbursts of anger and ever present sexual and racial discrimination." Br. of Appellant at 24. Again, she does not cite to the record or to any specific evidence. The record contains no evidence of Osborne "removing job responsibilities" from Chambers. The evidence shows incidents of Osborne's suspect behavior towards other employees including the "I could punch you in the face," and "Django" comments, as well as the altercation between Osborne and Heatherington. However, Chambers fails to explain the relevance of those actions to the retaliation she alleges. She never reported those comments to HR.

Finally, Chambers cites Osborne's statement in the February e-mail that in October 2016, he identified her as a manager to be "coached out." However, nine months separated Chambers' call to HR and the first indication by Osborne that her job was in jeopardy.

Rodda articulated a legitimate nonpretextual, nonretaliatory reason for Chambers' termination. It produced evidence of poor work performance. The evidence identifies Chambers' unsatisfactory management or "coaching" of her staff, and store finances. Although Osborne himself conducted the poor performance evaluations, the burden is one of production and not persuasion. Rodda met its burden.

Chambers must show that Rodda's reason was pretextual or that although the stated reason was legitimate, her report to HR was nevertheless a substantial factor motivating Rodda to discharge her. *Martin*, 191 Wn.2d at 726. To show that the reasons and documentation given by

Rodda are pretextual, Chambers argues that Rodda produced inconsistent reasons for her termination and the reasons given were false.

Wine cited Chambers' "poor performance of store's operations and financial outcome," and, given her experience, her "unfavorable progress" with the performance improvement plan. CP at 343. Rodda's letter to employment security department states "After prior warnings she failed to follow the directions given to achieve the goals set. She did not make acceptable progress in spite of substantial experience and a clear plan." CP at 349. Although the explanations do not all use the same language, they both refer to her 90-day performance improvement plan, the goals and directions of which are related to the store's operations and financial outcome. Finally, Osborne's supervisor explained that she was "let go because of [her] last [two] audits," which is consistent with "poor performance of the store's operations." CP at 266, 343.

Chambers also argues that Rodda's justifications of high employee turnover and poor financial performance are false. She first cites to the 0 percent employee turnover in the first four months of 2017. However, the turnover rate of the prior year was 139 percent, which exceeded the other stores' turnover rate by a significant amount.

Chambers also asserts that the Lacey store's sales were on an upward trend from January to March 2017. However, the operating statement shows a negative 8.28 percent decrease in the year to date (January through April) gross profit between 2016 and 2017. Additionally, the net income of the store is in the negative in 2013 and in 2015 through February 2017. Net income is identified as an area needing urgent improvement in Chambers' 90-day performance plan, which states in part "We are pleased with the sales increases that are posting for the first two months of 2017. It is imperative that we manage the expense and net income lines." CP at 329. Chambers

does not present evidence or argue that she implemented or carried out the "action items" identified in her performance plan.

Finally, Chambers cites several audits her store passed between 2010 and 2016 as evidence good performance. However, good performance in the past does not necessarily equate to good performance in the present. Furthermore, Chambers' implied argument that the failing audits given by Osborne were not genuine is undermined by the fact that Chambers received a failing audit from Osborne in October 2015, before her call to Wine, and she received a passing audit after the call.

In addition to the above, the only temporal evidence of causation is Osborne's "joke" that Heatherington should prepare to take over as manager the day after Chambers called HR. Even assuming Osborne knew about the call by that time, this "joke" is not enough to show that the HR complaint was a substantial factor in Rodda's decision to terminate her employment.

Rodda terminated Chambers' employment 17 months after her complaint to HR. Osborne identified her as a manager to be "coached out" 9 months after the complaint. "Discharge some length of time after the employee's filing of a claim will be less likely to reflect an improper motive connected with that claim." *Wilmot*, 118 Wn.2d at 69. The record shows that although Osborne may not have liked Chambers personally, the call to HR was not a substantial factor in her termination. She has also failed to show that Rodda's reasons for her termination were pretextual. The court did not err in granting summary judgement to Rodda.

III.    OUTRAGE

Chambers argues that the court erred in granting summary judgment to Rodda for the outrage claim because whether conduct is significant enough to be outrage is a question for the factfinder. We disagree.

The elements of the tort of outrage are: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987).

The conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. (AM. LAW INST. 1965)). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. *Phillips v. Hardwick*, 29 Wn. App. 382, 387, 628 P.2d 506 (1981).

Chambers argues for the first time on appeal that the manner in which Rodda terminated her employment supports a claim of outrage. We do not consider arguments made for the first time on appeal and we reject it. RAP 2.5

Chambers also seems to argue that Rodda should be held liable for outrage based on Osborne's intentional actions towards her. However, both Chambers' initial complaint and response to Rodda's motion for summary judgment fail to state what specific conduct by Osborne supports the claim for outrage. On appeal, Chambers again fails to point to any specific evidence to support her claim for outrage, apart from the "Django" comment. Chambers argues only that she "endured the relentless vitriol of a sexist, racist, verbally abusive bully whose glee derived from reminding her, and her employees, that she had low value and that he had the power to bring seventeen years of employment to an end." Br. of Appellant at 28. Chambers fails to establish a prima facie case of outrage. The court properly granted summary judgment to Rodda.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Worswick, J.

Sutton, A.C.J.