**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

AUG 1 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

SCOTT KINGSTON,

Plaintiff-Appellee,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION, a New York
corporation,

Defendant-Appellant.

No.   21-35548

D.C. No. 2:19-cv-01488-MJP

MEMORANDUM*

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted June 8, 2022
Seattle, Washington

Before:  GILMAN,** IKUTA, and MILLER, Circuit Judges.
Dissent by Judge IKUTA.

Scott Kingston sued International Business Machines Corporation (IBM) for

wrongful termination and retaliation in violation of Washington public policy and

the Washington Law Against Discrimination, alleging that he was fired for

---

\*      This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\*      The Honorable Ronald Lee Gilman, United States Circuit Judge for
the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

opposing what he believed to be wage theft and race discrimination. The jury found for Kingston and awarded him about $5 million in economic damages and $6 million in non-economic damages. The district court denied IBM's motions for judgment as a matter of law, a new trial, and remittitur. The district court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. "We review denial of a motion for judgment as a matter of law de novo, and denial of a motion for new trial and remittitur for abuse of discretion." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). We affirm in part, vacate in part, and remand with instructions to order remittitur of the excessive award of non-economic damages.

1.      IBM is not entitled to judgment as a matter of law on Kingston's wrongful-termination and retaliation claims. "Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion," so that "no reasonable juror could find" to the contrary. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (first quoting *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002), and then quoting *El-Haken v. BJY Inc.*, 415 F.3d 1068, 1072 (9th Cir. 2005)). Kingston presented evidence at trial that the stated reason for his termination was pretextual and that at least one of the IBM executives who made the termination decision was aware of his complaints and forwarded an email summarizing them to other decisionmakers during their

2

deliberations.

In particular, although IBM claims to have fired Kingston for declining to cap a white salesman's commission payment, the company apparently has a policy to the contrary—that commissions are uncapped. And the record shows that when Kingston learned that a black salesman would not be receiving his full commission, he told a sales executive that the decision was "completely unacceptable, it was a violation of the rules of our commission program," and that "in light of the recent payment" with the white salesman who *did* receive his full uncapped commission, "it looked like it might have been racial discrimination." That conversation was summarized in an email forwarded to Cindy Alexander, vice president of finance, explaining that Kingston "was not thrilled but understood" and IBM needed to make sure "'caps' are known up-front going forward" so "people don't think they are being singled out or treated unfairly." Although that email did not expressly refer to race discrimination, its author had instructed Kingston not to put the words "race discrimination" in email. Months later—on the same day that Alexander agreed to terminate Kingston—Alexander forwarded the email to the HR representative who had recommended firing Kingston. As the district court reasoned, "the jury could have considered this as evidence that Alexander and the Review Board were looking at Kingston's complaints about [the black salesman]'s treatment in making their termination

3

decision." And around the same time, Alexander expressed concern that "people were paid incorrectly vs what was approved, or something else is amiss" regarding the commission that went unpaid to the black salesman—again, even though the deliberations about terminating Kingston supposedly had nothing to do with that incident.

A reasonable jury could infer from that evidence that (1) Kingston was opposing or reporting what he believed to be employer misconduct in the form of race discrimination and withholding of earned wages, and (2) his opposition activity was known by decisionmakers and was "a substantial factor in IBM's decision to terminate" him. The district court therefore did not err in denying IBM's motion for judgment as a matter of law. For similar reasons, IBM is not entitled to a new trial on those claims. *See Crowley v. Epicept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) (per curiam) (explaining that the district court's decision not to grant a new trial is "virtually unassailable," and that "we reverse for a clear abuse of discretion only where there is an absolute absence of evidence to support the jury's verdict" (quoting *Desrosiers v. Flight Int'l of Fla., Inc.*, 156 F.3d 952, 957 (9th Cir. 1998) (emphasis omitted))).

2.      The jury instruction for wrongful termination based on reporting wage theft was not erroneous. The court instructed the jury that Kingston had to prove, in part, that he reported what he reasonably believed to be "employer misconduct

4

in the form of withholding of earned wages." Washington law encompasses "retaliation for whistleblowing on illegal *or wrongful* employer conduct." *Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 380 (Wash. 1996) (emphasis added). Thus, contrary to IBM's contention, the district court did not need to specify that the conduct had to be "unlawful." In any event, the withholding of earned wages *is* unlawful under Washington law. *See* Wash. Rev. Code § 49.52.050(2). And the district court did not abuse its discretion by refusing to give the jury an instruction on "at will" employment. *See Kastanis v. Educational Emps. Credit Union*, 859 P.2d 26, 35 (Wash. 1993), *amended by* 865 P.2d 507 (Wash. 1994).

3.      IBM is entitled to remittitur of the $6 million non-economic damages award. Under Washington law, "[a]n appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice." *Bunch v. King Cnty. Dep't of Youth Servs.*, 116 P.3d 381, 387 (Wash. 2005) (quoting *Bingaman v. Grays Harbor Cmty. Hosp.*, 699 P.2d 1230, 1233 (Wash. 1985)); *see also* Wash. Rev. Code § 4.76.030. We do not agree with IBM's assertion that Kingston's closing argument, to which IBM did not object, was unduly prejudicial. Nevertheless, the $6 million non-economic damages award is "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous." *Bunch*, 116 P.3d at 389

(quoting *Kramer v. Portland-Seattle Auto Freight, Inc.*, 261 P.2d 692, 697 (Wash. 1953)). Although we do not question that Kingston suffered psychological distress because of his termination, his distress does not appear to have been significantly greater than what anyone might suffer from being fired. Based on the evidence presented at trial, $6 million is shockingly excessive. It also far exceeds the amounts that Washington courts have upheld in similar cases—so far as we have been able to determine, no Washington court has upheld an award of greater than $1.5 million in non-economic damages in a wrongful-termination case. *See, e.g.*, *Collins v. Clark Cnty. Fire Dist. No. 5*, 231 P.3d 1211, 1231–32 (Wash. Ct. App. 2010) (upholding award of $875,000 in non-economic damages); *Elias v. City of Seattle*, 2 Wash. App. 2d 1039, 2018 WL 993644, at *4 (2018) (upholding awards of $1.5 million and $750,000 in non-economic damages). The district court is therefore ordered to reduce the non-economic damages award to an amount supported by the record and consistent with Washington law. If Kingston does not accept the remittitur, IBM is entitled to a new trial on the issue of non-economic damages.

The parties shall bear their own costs on appeal.

**AFFIRMED in part, VACATED in part, and REMANDED with instructions.**

*Scott Kingston v. IBM*, 21-35548

IKUTA, Circuit Judge, dissenting:

Can an employer be held liable for terminating an employee because of the employee's protected activities if the employer did not know about those activities? Apparently yes, according to the majority.

I

Washington law prohibits an employer from terminating an employee "because he or she has opposed any practices forbidden by" state anti-discrimination law. *See* RCW 49.60.210. Under the statute, the word "oppose" "carries i[t]s ordinary meaning: 'to confront with hard or searching questions or objections' and 'to offer resistance to, contend against, or forcefully withstand.'" *Lodis v. Corbis Holdings, Inc.*, 172 Wash. App. 835, 848 (2013) (citing Webster's Third New International Dictionary 1583 (2002)). Washington law also prohibits an employer from terminating an employee for whistleblowing, i.e., reporting employer misconduct. *Martin v. Gonzaga Univ.*, 191 Wash.2d 712, 721–23 (2018).

Kingston claimed that IBM terminated him because he opposed racial discrimination and reported the improper withholding of wages. In order to prevail, Kingston had to show that the relevant decisionmakers at IBM who decided to terminate him were aware of Kingston's opposition to and reporting of

these unlawful practices. *See Cornwell v. Microsoft Corp.*, 192 Wash.2d 403, 414 (2018) ("Because retaliation is an intentional act, an employer cannot retaliate against an employee for an action of which the employer is unaware."); *see also Martin*, 191 Wash.2d at 727.

But a quick review of the record shows that none of the relevant decisionmakers were aware that Kingston had engaged in such protected activities.

The record shows that Kingston was a second line manager who supervised two first line managers, who in turn supervised sales representatives, including Nick Donato and Jerome Beard. Kingston himself was supervised by a third-line manager, Dave Mitchell, who was subsequently replaced by Dorothy Copeland. Many other executives and decisionmakers were involved in the events at issue here, and a number of names are referenced below. But only one executive and decisionmaker is truly important here—Cindy Alexander, a Vice President of Finance—because in addition to being involved in the decision to terminate Kingston, she was the only decisionmaker who was supposedly aware of Kingston's protected activities.

In June 2017, Donato worked on a deal with SAS, which resulted in a multi-million dollar sales contract. Under one approach used for calculating commissions, Donato was owed a $1.6 million commission. Kingston approved

2

the commission, but questions arose due to the large amount, and Karla Johnson, Director of Sales Incentives, referred the matter to internal auditing and investigator Charles Larkin in October 2017.

In September 2017, Beard closed a deal with HCL worth roughly $16 million. Under the same approach used for calculating Donato's commission, Beard was owed roughly $1.5 million. Kingston approved the commission. Again, questions arose due to the size of the commission. Brian Mulada, the chief financial officer of the relevant IBM business unit, Maria Lipner, Vice President of Global Sales Incentives, and Karla Johnson agreed that a different approach should have been used to calculate the commission. In November 2017, Mulada told Rose Nunez, an IBM Director of Channel Management, that the $1.5 million commission was "inappropriate and unacceptable given the nature of this transaction." Nunez agreed.

Soon after, Nunez discussed the commission issue with Kingston. According to Kingston, he argued that because Beard was black and Donato was white, reducing Beard's commission and not Donato's would raise questions about racial discrimination. Kingston also claims he argued that reducing Beard's commission was improper because it raised the goalposts on compensation after the fact.

On November 14, 2017, Nunez summarized her conversation with Kingston in the following email addressed to Mulada:

> Brian – I connected with Scott yesterday. He was not thrilled but understood.
>
> His general comments:
>
> 1. Make sure these "caps" are known up-front going forward. They are okay with the limitation but they don't want reps think they are being singled out or treated unfairly
> -It is like playing football, winning the game, then someone tells you the touchdowns are now worth 3 pts instead of 7 pts.
> -I made the justification clear as this is related to broader deals coordinated by JEK
> 2. Remove this from the base for next year plan……if we cap this looking backward AND use this is the baseline for planning to establish next year quota, this will be tough to explain.
>
> Other than that, he gets it….he agrees that $1.5M is a lot.
> Let me know if you want to talk.

Mulada forwarded Nunez's email to Cindy Alexander on November 15, 2017.

By February 2018, the internal audit Johnson had initiated in October 2017 regarding Donato's commission was complete. The resulting report determined that Kingston had been negligent in approving Donato's $1.6 million commission, and recommended that IBM "[t]ake appropriate disciplinary action with Mr. Kingston for not initiating an adjustment for excessive commissions paid to Mr. Donato."

4

After receiving this report, Linda Kenny, an HR Case Manager at IBM, recommended that IBM terminate Kingston. Kenny forwarded her recommendation to Russ Mandel, the North America Consistency Leader, for approval, and Mandel approved Kenny's recommendation. Kenny then requested and received approval from Dorothy Copeland, Kingston's new supervisor. Finally, Kenny requested and received approval from the Review Board for Kingston's business unit, which was composed of Lisa Mihalik, Cindy Alexander, and Scott Ferrauiola. After Kenny received all necessary approvals to terminate Kingston, he was subsequently terminated.

Kingston then sued IBM on the theory that IBM fired him due to his complaints about race discrimination and the improper withholding of wages. The jury found in favor of Kingston, and the district court rejected IBM's motion for judgment as a matter of law on Kingston's claims of illegal retaliation and wrongful termination, or in the alternative, for a new trial.

## II

As this recital of the facts makes clear, there is no evidence that Linda Kenny, Russ Mandel, Scott Ferrauiola, Lisa Mihalik— four of the five relevant decisionmakers in Kingston's termination—heard anything about Kingston's complaints regarding IBM's decision to reduce the commission owed to Beard.

5

Although Kingston claimed that he expressed concerns to other IBM employees (namely to his supervisors (Mitchell and Copeland) and to investigator Charles Larkin), none of them were decisionmakers, and there is no evidence that any of them informed the decisionmakers about Kingston's statements. Indeed, Mitchell and Larkin expressly denied talking to the decisionmakers about Kingston's concerns.

The fifth decisionmaker, Cindy Alexander, had only one piece of relevant information—Nunez's email to Mulada, which was forwarded to Alexander. But even viewing this email in the light most favorable to Kingston, it is not evidence that Kingston engaged in protected activity by opposing racial discrimination or whistle-blowing about employer misconduct. Nothing in the email shows that Kingston confronted his employer "with hard or searching questions or objections" or offered resistance to IBM with respect to alleged race discrimination. *Lodis*, 172 Wash. App. at 848 (citation omitted).[1] Nor does anything in the email show

---

[1]The majority incorrectly states that Nunez's email "summarized" Kingston's alleged conversation about racial discrimination and the improper withholding of wages. **Majority at 3.** The full text of Nunez's email is provided above, and did not summarize those issues.

Further, the majority's statement that Nunez "had instructed Kingston not to put the words 'race discrimination' in email" is entirely irrelevant to our analysis. **Majority at 3.** The only question before us is whether Nunez's email would make a reader aware of Kingston's protected complaints, and on its face, Nunez's email

(continued...)

that Kingston was reporting that IBM engaged in misconduct by wrongfully withholding wages. Rather, the email merely shows that Kingston was concerned about the effects that reducing commissions would have on morale and advised his supervisors on how to better implement their policy going forward. Accordingly, the email says that Kingston was "not thrilled" with IBM's approach "but understood," and recommended IBM set the ground rules more clearly in advance to avoid future disappointment. Kingston thought that the sales representatives would be "okay with the limitation[s]" so long as they did not think they were being "singled out or treated unfairly." Kingston also recommended that the deal should be removed from the base for the next year's plan, because it "will be tough to explain." Nunez summed up that Kingston "gets it" and understood IBM's reasoning that the $1.5 million commission "is a lot."

In an effort to disguise the lack of any evidence that the decisionmakers knew about Kingston's protected activities, the majority offers some irrelevant information. First, the majority notes that around the time the review board was considering Kenny's recommendation to terminate Kingston, Alexander forwarded Nunez's email to Kenny. **Majority at 3.** Because Kenny had already

_____

[1](...continued)
did not do so.

7

recommended firing Kingston, and the email does not indicate that Kingston engaged in protected activities, this sheds no light on the basis for the decision to fire Kingston. Second, the majority points out that around that same time, Alexander sent an email to various individuals involved in the HCL transaction. **Majority at 4.** The email stated that because the amount "paid on HCL" was "well beyond what was authorized," it must be that "something is wrong. Either people were paid incorrectly vs what was approved, or something else is amiss." Again, this statement demonstrates no awareness of Kingston's protected activities.

Because Nunez's email does not indicate that Kingston opposed racial discrimination or reported employer misconduct, and thus failed to make the decisionmakers aware of Kingston's protected activities, Kingston is left with the argument that the jury could have believed that other employees who heard Kingston's complaints *could have* communicated with the relevant decisionmakers, and that the jury could disbelieve any statements to the contrary. Such speculation does not constitute evidence. *See* 9A Wright & Miller, *Federal Practice and Procedure* Civil 2d § 2527, at 288 (1990) ("The party with the burden of proof does not make an issue for the jury's determination by relying on the hope that the jury will not trust the credibility of the witnesses . . . [t]here must be some affirmative evidence that the event in question actually occurred."). In other

8

words: there was *no* evidence that any person responsible for the decision to terminate Kingston knew that he had opposed racism or reported the improper withholding of wages. Because no IBM decisionmaker knew that Kingston had engaged in protected activities, IBM could not possibly have fired him because of those protected activities.

## III

Judgment as a matter of law "is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). In this case, there is no evidence in the record that the decisionmakers who terminated Kingston knew that Kingston opposed racism and the improper withholding of wages. When there is no evidence of a crucial element of the plaintiff's case, the jury's ruling cannot be sustained. Therefore, IBM is entitled to judgment as a matter of law, or in the alternative to a new trial. *See Crowley v. Epicept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) (per curiam). Accordingly, I dissent.