IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| VALERIE O'MEARA, an individual, | No. 86794-6-I |
| Appellant, | |
| v. | DIVISION ONE |
| CIRCLE MEDICAL CARE OF CALIFORNIA, a California Company, | UNPUBLISHED OPINION |
| Respondent. | |

SMITH, J. — Valerie O'Meara worked for Circle Medical Care of California as a nurse practitioner. After O'Meara was terminated in 2022, she initiated a complaint against Circle Medical for retaliation and wrongful termination. Circle Medical moved for summary judgment, which the trial court granted. The trial court denied O'Meara's request for a continuance of the motion and, later, her motion for reconsideration. O'Meara appealed. Because O'Meara cannot establish a prima facie case of retaliation or wrongful termination, and the court did not abuse its discretion in denying her CR 56(f) motion, we affirm.

FACTS

Background

In August 2021, Valerie O'Meara, a nurse practitioner, entered into an independent contractor services agreement with Circle Medical Care of California to provide primary care to patients. Circle Medical utilized the online messaging

system Slack[1] as its primary tool for internal communications among team members, including full-time employees and contract providers. Every employee and contractor has access to certain channels within Slack, including the #telemed-provider-team channel, which offered a platform for providers to ask questions and connect with one another.

During the relevant time O'Meara worked for Circle Medical, Jennifer Herrera was the associate medical director for Circle Medical. One of Herrera's responsibilities in this role was to answer provider questions in the #telemed-provider-team channel and monitor the chat. Herrera was also a member of the #tpt-clinical-coaching channel, a private channel were telemedicine provider coaches could communicate clinical or operational concerns to members of senior leadership. Herrera asked that all coaches communicate to her weekly via this channel any concerns they had about fellow contractors.

In December 2021, Ashley Bailey, a nurse practitioner and peer coach, raised concerns in the #tpt-clinical-coaching channel about O'Meara's behavior in the #telemed-provider-team channel. Herrera reviewed the comments and noted O'Meara "tend[ed] to give personal advice rather than[] following protocol." Herrera was concerned that O'Meara voiced her disagreement with one of Circle Medical's primary care providers and "attempted to discredit [the doctor's] professional opinion in a public Slack channel." In response to a coach recommending they ask O'Meara to take a break from answering Slack

_____

[1] Slack is an online communication platform that allows teams to chat and share files.

questions, Herrera suggested, "let's not have her take a break, but rather educate her that she should be referencing our policies / the portal if she is going to respond to other providers' inquiries."

On March 28, 2022, O'Meara responded to two separate questions in the #telemed-provider-team channel. In response to a question about accepting Medicaid, O'Meara noted her dissatisfaction with Circle Medical's current Medicaid verification process. O'Meara stated a patient was "wasting my time as I cannot see her yet she is on my schedule – administration for Circle should be doing insurance verification before a provider is assigned as I have no role here, thanks." In another thread that same day, O'Meara replied to a post by PJ Chiang, Circle Medical's associate medical director, concerning error reports.[2] In the public channel, O'Meara commented, "Oh you mean like how I got notified yesterday of a 'not responding to [a patient] timely' from a month ago, to a [patient] asking a vague question – while I was not working (4.5 days) and I was reminded to 'keep up on the chats I initiate'? It should have been addressed by an RN or an appt scheduled with me."[3] Chiang asked O'Meara if she wanted to discuss a specific concern in a private channel with a clinical coach, to which O'Meara replied, "Thought it was private – But it's okay - I don't need to be coached about this."

---

[2] Error reports are an unofficial method of communicating an error in workflows to a provider.

[3] O'Meara was responding to the comment, "[T]hese requests are getting filtered into the correct buckets and queues for the covering provider to check. [O]r else we get over tagged in slack – which is fine, but it is also easy to miss things."

That same day, March 29, 2022, Chiang privately messaged O'Meara regarding O'Meara's comments in the #telemed-provider-team channel. In response, O'Meara raised concerns about "contract workers being 'asked' to work like employees." O'Meara stated she was frustrated about "the slow creep of being asked to work without compensation." She told Chiang that she felt Circle Medical was misclassifying providers and "[i]t is the company's responsibility to classify and staff correctly." Chiang told O'Meara she should discuss this issue with Doris Martini, Vice President of Operations.[4]

Again, on March 29, 2022, O'Meara replied to another question in the #telemed-provider-team channel about proof of diagnosis for a new patient. O'Meara stated the proof of diagnosis was "not even close" to adequate and the telemedicine company who originally diagnosed the patient sounded "like a pill mill." When another provider responded that she considered the proof of diagnosis adequate and the provider was not a pill mill, O'Meara replied, "We can agree to disagree."

That same day, provider coach Kerri Taylor alerted Herrera in the #tpt-clinical-coaching channel that O'Meara had "an explosive day on three different threads on [S]lack." Taylor noted that O'Meara had similar outbursts in the past and had "responded very negatively to a report she had a few weeks ago." Herrera reviewed the comments in the #telemed-provider-team channel and

_____

[4] O'Meara alleges she had a video call with Martini towards the end of March where she discussed renegotiating her pay and her misclassification. But Martini maintains the only time O'Meara mentioned the issue of misclassification was in an April 6, 2022, slack message from O'Meara.

4

concluded "O'Meara's messages . . . were decidedly unhelpful, distracting, confusing to new telemedicine providers, aggressive, and undermined the purpose of the channel."

On April 5, 2022, Nicki Thorne, a quality assurance provider and peer coach, posted a concern about O'Meara in a private Slack channel that included Herrera and Martini. O'Meara had filed an error report documenting an error by another practitioner but after reviewing the report, Thorne believed the error was not on the part of the practitioner reported, but by O'Meara. Thorne noted that O'Meara's note was "lacking a quality assessment" and was "very judgmental and . . . not objective." Herrera reviewed the report and agreed with Thorne's assessment. Thorne offered to have a one-on-one meeting with O'Meara to discuss the error report, to which Herrera agreed.

Before Thorne met with O'Meara, O'Meara reached out to Martini to express her frustration concerning Thorne's feedback on her error report. The messages to Martini read:

> WTH is wrong with Nicki Thorne? Unbelievable interaction with her. I am NOT pleased.

> So- as an independent contractor, Nicki does not tell me that I have to fill out 'templates' or anything about how I do my job- I sent in a report about a patient I thought had not been properly [diagnosed] with ADHD, no medical records, no part 2 assessment, and had been seeing a different provider every visit - so asking her to review that - Instead of addressing this she wanted to scrutinize and criticize MY note. Very irritable affect and saying "this reads as judg[]mental" So what? I'm allowed to be judgmental[.] It's called caution[.] So she seemed more interested in retaliating than addressing my concern. If this is her idea of QA, she is risking losing a 30+ year Ivy League educated primary provider over it.

Thorne met with O'Meara on April 6, 2022.  After the meeting, Thorne reported to Herrera and Martini in a private chat that the "1:1 did not go well."  Thorne met with Herrera and Nicole Tsang, Circle Medical's chief medical officer that same day.  Thorne told Herrera and Tsang that during her meeting with O'Meara, O'Meara was defensive and not receptive to her feedback.  After talking with Thorne, Herrera became concerned about O'Meara's understanding of her role and responsibilities, as well as her professionalism and willingness to conduct thorough assessments of patients.

Later that day, after meeting with Thorne, O'Meara sent Martini another message stating she had ended the meeting with Thorne "because of her attitude."  O'Meara then asked Martini, "[H]ow did Circle decide that NPs and PAs are properly classified as independent contractors?"  She asked for a written response by April 11, 2022.

On April 8, 2022, O'Meara engaged in another conversation in the #telemed-provider-team Slack channel concerning a patient's missing medical records.  O'Meara challenged one of the provider's recommendations in the chat, and questioned the practices of Circle Medical provider Dr. Les Tsang, who was not a party to the conversation or involved in the patient's care.

After reviewing all the Slack communications by O'Meara and considering the information shared by Thorne, Herrera and Tsang determined "O'Meara demonstrate[ed] a pattern of unprofessionalism, failure to follow appropriate workflows, and an aggressive attitude towards her peers."  Herrera and Tsang

6

decided to terminate O'Meara's contract. O'Meara was notified of her termination by e-mail on April 11, 2022.

Procedural History

In July 2022, O'Meara initiated a complaint against Circle Medical for wrongful retaliation and termination. O'Meara's first interrogatories to Circle Medical in March 2023, included the question, "Describe with particularity each reason to terminate [O'Meara's] employment/services." In its March 2023, response, Circle Medical stated, "The decision was precipitated by the fact that [O'Meara] had been rude and offensive during an interaction with Nickie Thorne, FNP."[5] Circle Medical's response also included the names and addresses of persons who Circle Medical believed may have knowledge relating to the allegations, claims, or defenses, including Nickie Thorne.

In September 2023, Circle Medical served its disclosure of possible primary witnesses that included, among others, Nickie Thorne. O'Meara first attempted service of a deposition subpoena on Thorne on February 19, 2024, but Thorne's address was incorrect. On February 23, 2024, Circle Medical moved for summary judgment. The summary judgment hearing was set for March 22, 2024. On March 6, 2024, O'Meara requested Circle Medical supplement its interrogatory response with Thorne's correct address. On March 11, 2024, O'Meara filed her opposition to Circle Medical's motion for summary judgment

---

[5] In June 2023, Circle Medical supplemented its answers, adding O'Meara "was not receptive to the feedback [from Thorne] and became rude and offensive and subsequently stated that she was not obligated to accept coaching because she was an independent contractor."

and also requested the court grant a continuance in order for her to conduct additional discovery and depose Thorne.[6] After the summary judgment hearing, the court entered an order denying O'Meara's request for a continuance and granting Circle Medical's summary judgment motion. O'Meara moved for reconsideration twice—first for granting Circle Medical's summary judgment motion, then for denying her CR 56(f) motion—and the court denied both motions. O'Meara appeals.

ANALYSIS

O'Meara contends the court committed error in granting Circle Medical's motion for summary judgment. This court reviews a summary judgment motion de novo. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Scrivener*, 181 Wn.2d at 444. All facts and reasonable inferences are viewed in the light most favorable to the nonmoving party. *Litvack v. Univ. of Wash.*, 30 Wn. App. 2d 825, 842, 546 P.3d 1068 (2024).

Retaliation

O'Meara contends the trial court erred in dismissing her retaliation claim because she offered evidence of temporal proximity between her complaints and her termination, as well as evidence supporting an inference of the decisionmaker's knowledge of her protected complaints. Circle Medical claims

---

[6] The discovery deadline was set for April 1, 2024.

O'Meara has not met her burden because she fails to establish a prima facie case of retaliation.  We agree with Circle Medical.

The Washington Equal Pay and Opportunities Act, chapter 49.58 RCW, provides, "An employer may not discharge or in any other manner retaliate against an employee for: (a) inquiring about, disclosing, comparing, or otherwise discussing the employee's wages or the wages of any other employee; [or] (b) asking the employer to provide a reason for the employee's wages." RCW 49.58.040(2).  Because direct evidence of retaliation is rare, Washington has adopted the evidentiary burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

The *McDonnell Douglas* framework includes a three-step analysis.  First, the employee must establish a prima facie case of retaliation.  If the employee is able to establish a prima facie case, the burden then shifts to the employer, "who must 'articulate a legitimate, nondiscriminatory reason for the adverse employment action.' "  *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017) (quoting *Scrivener*, 181 Wn.2d at 446).  If the employer is able to identify such a reason, the burden then shifts back to the employee to "produce sufficient evidence[7] showing that the [employer]'s alleged

---

[7] Circle Medical cites to *Hill v. BTCI Income Fund*, 144 Wn.2d 172, 181-82, 23 P.3d 440 (2001) to contend O'Meara's burden is one of persuasion, not merely production, but Circle Medical misinterprets the case.  *Hill* notes that while the burden to overcome summary judgment is one of evidentiary production, the ultimate burden at trial is one of persuasion.  *Id.  See also Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 412, 430 P.3d 229 (2018) ("At the summary judgment stage, the plaintiff's burden is one of production, not persuasion.")

nondiscriminatory reason for the adverse employment action was a pretext." *Mikkelsen*, 189 Wn.2d at 527.

Summary judgment for an employer is rarely appropriate in a retaliation case because of the difficulty of proving discriminatory motivation. *Litvack*, 30 Wn. App. 2d at 844. To overcome summary judgment, "the employee needs only to present evidence sufficient to create a genuine issue of material fact whether 'discrimination was a substantial factor in an adverse employment action, not the only motivating factor.' " *Mikkelsen*, 189 Wn.2d at 534 (quoting *Scrivener*, 181 Wn.2d at 447). But, if an employee creates " 'only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred,' summary judgment is proper." *Milligan* v*. Thompson*, 110 Wn. App. 628, 637, 42 P.3d 418 (2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). Accordingly, it is only when the record establishes " 'reasonable but competing inferences' " of retaliation will the employee overcome summary judgment. *Mikkelsen*, 189 Wn.2d at 528 (quoting *Scrivener*, 181 Wn.2d at 445).

A plaintiff may rely on "circumstantial, indirect, and inferential evidence to establish discriminatory action." *Mikkelsen*, 189 Wn.2d at 526. Inferences must be reasonable and based on facts. *State v. Maxey*, 63 Wn. App. 488, 491, 820 P.2d 515 (1991). The employee cannot rest their case on opinions or conclusory statements. *Chen v. State*, 86 Wn. App. 183, 190, 937 P.2d 612 (1997).

1. Prima Facie Case

To establish a prima facie case of retaliation, an employee must show "(1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018). Causation " 'may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision.' " *Cornwell*, 192 Wn.2d at 416 (internal quotation marks omitted) (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003)). But, proximity alone does not amount to causation. *Cornwell*, 192 Wn.2d at 414-15. To prove causation, an employee must be able to show that the employer had knowledge the employee engaged in a protected activity. *Cornwell*, 192 Wn.2d at 414 ("Because retaliation is an intentional act, an employer cannot retaliate against an employee for an action of which the employer is unaware.").

The standard for knowledge can be actual knowledge or that the employer "knew or suspected" the employee engaged in protected action. *Cornwell*, 192 Wn.2d at 416-17. This standard "requires the production of *evidence*; mere speculation will not suffice to defeat summary judgment." *Cornwell*, 192 Wn.2d at 420.

Here, O'Meara contends the proximity between her complaints and her termination is, by itself, sufficient to support a causal link.[8] O'Meara cites to several cases to support this assertion,[9] but these cases are distinguishable. In each of the cases, when the employer initiated the adverse action, they were aware that the employee engaged in a statutorily protected activity. While O'Meara is correct that her complaints and her termination occurred within a very close time period (two weeks), she cannot establish that the Circle Medical management team responsible for her termination were aware of her complaints.

O'Meara relies solely on speculation to assert Herrera and Tsang were aware of her complaints when they terminated her employment. While inferences are allowed to support a prima facie case of retaliation, the inferences must be reasonable and based on facts—"mere speculation will not suffice." *Cornwell*, 192 Wn.2d at 420. No facts existed to support an inference that Herrera and Tsang were aware of O'Meara's complaints. Herrera and Tsang were the only Circle Medical employees who participated in the decision to terminate O'Meara. O'Meara provided no evidence that Herrera or Tsang were aware that O'Meara had made complaints to Chiang or Martini regarding classification or pay. Chiang and Martini confirmed they did not discuss O'Meara's complaints with Herrera or Tsang, nor did either of them participate in

---

[8] Circle Medical does not dispute that O'Meara satisfied the first two elements of establishing a prima facie case.

[9] *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); *Estevez v. Faculty Club of Univ. of Wash.*, 129 Wn. App. 774, 799, 120 P.3d 579 (2005); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

the discussion to terminate O'Meara.  And it is undisputed that O'Meara never expressed her concerns with Herrera.

O'Meara contends the mere fact that Chiang and Martini were members of Circle Medical's management team along with Herrera and Tsang creates a reasonable inference that Chiang and Martini discussed O'Meara's complaints with Herrera and Tsang.  But this "inference" is mere speculation, unsupported by any facts in the record.

O'Meara also claims it is reasonable to infer that, because Thorne discussed her assessment of O'Meara with Chiang and Martini, that assessment must have informed Circle Medical's decision to terminate her.  But, even if that assessment did inform Circle Medical's decision, there was nothing in the assessment indicating O'Meara was dissatisfied with her classification or pay.  The only thing the assessment said about classification was, "I'm [O'Meara] an independent provider and I don't have to fill out the macro completely."  Nothing in Thorne's note or Slack messages indicate she viewed this comment as O'Meara complaining about her contractor status, or that she shared this comment with Herrera or Tsang.

Because O'Meara fails to establish a causal link between her protected activity and subsequent termination, she cannot show a prima facie case of retaliation.[10]

---

[10]  Because we conclude O'Meara cannot establish a causal connection between her complaints and termination, we need not analyze the remainder of the *McDonnell Douglas* framework.  However, we do note that, even if O'Meara could establish a prima facie case of retaliation, she still could not show Circle Medical's reason for termination was pretext.  Contrary to O'Meara's arguments,

Wrongful Termination

O'Meara claims the trial court erred when it dismissed her wrongful termination claim because she presented evidence of causation between her complaints and her subsequent termination. Circle Medical contends O'Meara's wrongful termination claim fails for the same reasons as her retaliation claim. We agree with Circle Medical.

Wrongful termination is a tort claim arising from the same statute as a retaliation claim. RCW 49.58.040(2). Washington courts recognize " 'a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy." *Wilmot v. Kaiser Alum. & Chemical Corp.*, 118 Wn.2d 46, 53, 821 P.2d 18 (1991) (quoting *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984)). A public policy mandate is contravened when an employee is terminated as a result of exercising a legal right or privilege. *Wilmot*, 118 Wn.2d at 53. Under RCW 49.58.040(2), "[a]n employer may not discharge or in any other manner retaliate against an employee for: (a) inquiring about, disclosing, comparing, or otherwise discussing the employee's wages or the wages of any other employee; [or] (b) asking the employer to provide a reason for the employee's wages."

To survive a motion for summary judgment on a wrongful termination claim, the employee must show "(1) that his or her 'discharge may have been

Circle Medical did not change their basis for termination. O'Meara's pattern of inappropriate behavior—clearly evidenced in the collection of Slack messages— was the reason for her termination. The meeting with Thorne was simply the "last straw" for Circle Medical.

motivated by reasons that contravene a clear mandate of public policy,' and (2) that the public-policy-linked conduct was a significant factor in the decision to discharge the worker." *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 577-78, 459 P.3d 371 (2020) (citation and internal quotation marks omitted) (quoting *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 725, 425 P.3d 837 (2018)).

Wrongful termination is analyzed under the same standards applicable to a retaliation claim, and the *McDonnell Douglas* test applies. *See Wilmot*, 118 Wn.2d at 68; *see also Mackey*, 12 Wn. App. 2d at 571. Because O'Meara is not able to establish a causal link between the protected action and her termination,[11] O'Meara's wrongful termination claim fails for the same reasons as her retaliation claim.

## CR 56(f)

O'Meara contends the trial court erred when it denied her request for a CR 56(f) continuance. Circle Medical maintains the court's denial was an appropriate exercise of discretion because O'Meara did not provide a reasonable explanation for her delay in attempting to secure Thorne's deposition testimony. We agree with Circle Medical.

A trial court's denial of a CR 56 motion to continue a summary judgment hearing is reviewed for abuse of discretion. *Pitzer v. Union Bank of California*, 141 Wn.2d 539, 556, 9 P.3d 805 (2000). "A court abuses its discretion if its decision is based on untenable grounds or untenable reasons." *Briggs v. Nova Serv.*, 135 Wn. App. 955, 961, 147 P.3d 616 (2006).

---

[11] *See* discussion *supra*.

Under CR 56,

> [s]hould it appear from the affidavits of a party opposing the motion that for reasons stated, the party cannot present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A court may properly deny a motion for continuance under any of the following circumstances: " '(1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact.' " *Pitzer*, 141 Wn.2d at 556 (internal quotation marks omitted) (quoting *Tellevik v. Real Property*, 120 Wn.2d 68, 90, 838 P.2d 111 (1992)).

Here, O'Meara claims her delay was caused by Circle Medical's failure to provide her with Thorne's correct address.[12] O'Meara contends she repeatedly attempted to serve subpoenas on Thorne but Circle Medical provided the wrong address and, when she requested updated contact information, Circle Medical did not respond. O'Meara likens her circumstances to *Tellevik*, but the facts of that case are distinguishable.

In *Tellevik*, the plaintiff requested additional time to obtain, through discovery, facts necessary to overcome summary judgment. 120 Wn.2d at 89-

---

[12] O'Meara also claims her request was reasonable because she stated what evidence would be established through the discovery and provided support that the evidence would raise a genuine issue of material fact. Because the court granted the continuance based on O'Meara's delay, Circle Medical does not respond to those assertions and finding no error by the trial court, we need not address them either.

16

90. The trial court denied the motion, but on appeal, the Supreme Court reversed, noting, "The necessary information was not obtained because defendants' counsel did not provide the requested documents when asked informally nor when served with requests for production." *Id.* at 91. But here, unlike in *Tellevik*, the delay of the original request is also an issue.

O'Meara provided no explanation for why she waited until February 19, 2024, to first attempt service of a deposition subpoena on Thorne. O'Meara knew Thorne was a percipient witness as early as June 2023. Additionally, the court noted in its order that O'Meara provided no support for her assertion that Circle Medical prevented the deposition of Thorne.

Because O'Meara did not offer a good reason for her delay in seeking Thorne's deposition, we conclude it was not an abuse of discretion to deny her CR 56(f) motion.

Attorney Fees

RAP 18.1 provides that applicable law may grant a party the right to recover reasonable attorney fees on review. A party requesting fees under RAP 18.1 must provide argument and citation to authority "to advise the court of the appropriate grounds for an award of attorney fees as costs." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012). Under RCW 49.58.070, an employee bringing an action pursuant to RCW 49.58.040 may requests costs and reasonable attorney fees.

O'Meara contends she is entitled to attorney fees as the prevailing party on appeal.  But O'Meara is not the prevailing party on appeal, so we decline to award her fees.

We affirm.

_Smith, J._

WE CONCUR:

_Feldman, J._      _Coburn, J._