
FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE SEP 1 3 2018
Fairhurst, CJ.
CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Sept 13, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DAVID MARTIN, | ) | |
| | ) | |
| Petitioner, | ) | No. 95269-8 |
| | ) | |
| v. | ) | |
| | ) | |
| GONZAGA UNIVERSITY, | ) | |
| | ) | Filed _____ SEP 1 3 2018 _____ |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHRIS STANDIFORD, et ux., | ) | |
| | ) | |
| Defendants. | ) | |

OWENS, J. — Gonzaga University discharged David Martin, the plaintiff in

this case. Martin sued Gonzaga, alleging that he was wrongfully discharged

because of his whistle-blowing, and asserting a private claim under RCW

49.12.250 for an alleged violation of that statute's requirement that Gonzaga

provide him with his complete personnel file. Gonzaga successfully moved for

summary judgment on both claims. The Court of Appeals affirmed the dismissal

of the wrongful discharge claim but remanded the personnel file claim for further findings of fact.

The main issue on appeal to this court is whether the Court of Appeals applied the correct test to Martin's whistle-blower claim. We find that the Court of Appeals applied the incorrect standard, one reserved for wrongful discharge claims that do not fit into the four recognized categories of wrongful discharge claims, rather than the standard used for wrongful discharge claims based on whistle-blowing, one of the recognized categories of claims. However, we affirm the Court of Appeals' ultimate holding that Gonzaga is entitled to summary judgment on the wrongful termination claim. We further find that Martin's statutory claim regarding his personnel file is not yet justiciable and thus reverse the Court of Appeals' holding on that claim. The trial court correctly held that Gonzaga is entitled to summary judgment on both claims.

## PROCEDURAL AND FACTUAL HISTORY

This action stems from Martin's employment at Gonzaga University's Rudolf Fitness Center. Gonzaga University opened the Rudolf Fitness Center in 2003. The fitness center is a part of the athletic department at the university. Until 2012, there was no padding on the walls in the fitness center's basketball field house. The university began discussing whether padding should be installed in 2004. In 2004, Chris Standiford, senior associate athletics director, directed Jose Hernandez, assistant

2

athletics director, to work with a risk manager in determining whether the pads were necessary. The university declined to install the padding. In 2007, another study was conducted, and Hernandez recommended to the administration that pads be installed. Several students had been injured from accidental impact with the bare concrete walls.

Gonzaga University hired Martin in 2008 to work as an assistant director of the fitness center. Martin was an at-will employee and was not subject to a written contract for a definite term of employment. Martin received benefits, including a tuition benefit, which he used to enroll in Gonzaga University's master's degree program for sports administration. Martin was supervised by Hernandez, who reported to assistant athletic director Joel Morgan, who reported to Standiford, who reported to athletic director Mike Roth.

Martin's April 2011 job evaluation rated him below average for interpersonal skills, problem solving, professional development, and leadership responsibilities. Hernandez deemed Martin's overall performance below the quality and standard that Martin was capable of, noting that his "inconsistent performance kept him from meeting the basic job requirements." Clerk's Papers (CP) at 128. The evaluation went on to say that "[t]hroughout the academic year, at times [Martin] displayed great work ethics and at other times he would not. This up and down behavior and conduct was a surprise and is uncharacteristic of him." *Id.* After the evaluation, Hernandez asked Martin how Hernandez could improve his own performance and how the fitness

center could improve. Martin proposed starting a new swimming program and expressed dissatisfaction with the fitness center staff's lack of teamwork and resistance to change. He did not mention safety at the basketball courts. Hernandez counseled Martin on his resistance to following protocol and improving his communication with colleagues to be less abrasive and insensitive.

As a part of his master's degree program, Martin wrote a proposal to improve the fitness center, which he alleges included a swimming program as a way to generate funds for wall padding at the basketball court. There is no copy of the proposal in the record, and no one other than Martin has testified to verify its contents. Martin gave the proposal to Hernandez and asked if he could submit it to Standiford, who oversaw the budget. According to Martin, Hernandez granted him permission. Hernandez denied that he gave Martin permission. On February 29, 2012, Martin sent Standiford his proposal in an e-mail and requested a meeting to discuss it with him. The e-mail was titled "Future Pool Proposal" and did not mention student safety concerns resulting from the lack of protective padding in the basketball court. CP at 115. Standiford responded by explaining that "[i]t is more organizationally appropriate for you to provide Jose [Hernandez] with the proposal for consideration. If you have already done this, and Jose [Hernandez] supports the proposal, I would suggest he meet with Joel [Morgan] for further consideration and deliberation." CP at 114. Martin replied,

4

In the politest possible way . . . according to our organizational layout in the Policies and Procedures Manual, pg. 6, there is no such line of communication or organization hierarchy established for the RFC [Rudolf Fitness Center] staff to follow. I have Jose's consent in this matter and I understand that you are an extremely busy individual, I wouldn't be asking for your time if I didn't plan on using it to the fullest. Imagine this as a "golden ticket" idea. Something that I don't want others corrupting or taking credit for. I would ask that you please meet with me and hear my thoughts on this matter. If it needs to wait until after you return, then so be it, but I have worked hard on this and would appreciate your audience, and your audience alone.

*Id.* The e-mail gave Standiford concern that Martin was trying to generate income for himself in violation of the university's mission, and so he contacted Hernandez and Morgan and asked them to contact human resources for advice on how to proceed.

Hernandez scheduled a meeting with Martin and Morgan for the next day, March 1, to express disappointment that Martin had disobeyed Standiford's direction and to deliver a letter of expectations to Martin. After Hernandez informed Martin of the meeting, Martin said, "'You cannot make me go.'" CP at 121. Hernandez told him to attend; otherwise, his employment standing would worsen. At the meeting, Martin argued with and interrupted Hernandez. Hernandez told Martin he would receive a letter of expectations and his performance would be evaluated over the following two weeks. Morgan told Martin to provide him with his proposal, and Martin refused. Martin asked to leave the meeting and left. *Id.* Martin then found another associate director of the fitness center, Shelly Radtke, and yelled at her that she needed to give him permission to leave work. Martin persuaded Andrew Main, an

assistant director, to cover his shift but did not ask permission from Hernandez to leave work early. Main told Hernandez and Morgan that Martin told him, "Joel [Morgan] is upset I went over his head and Jose [Hernandez] is a push over." CP at 216. Morgan and Heather Murray, from human resources, agreed that Martin should be placed on administrative leave for his actions during and after the meeting. The next day, March 2, Hernandez notified Martin of this decision and told him the terms of his leave prohibited him from contacting anyone at the university except human resources staff and Hernandez.

On March 5, Martin called the executive assistant to the university's president and requested a meeting with President Thayne McCulloh to present a proposal. The executive assistant told Martin to follow the chain of command within the athletics department. The next day, Martin sent President McCulloh his proposal in an e-mail. The e-mail does not mention safety concerns related to the lack of padding in the basketball courts. On March 6, the president's executive assistant responded by e-mail, reiterating that Martin must follow the chain of command to submit the proposal. She then forwarded the e-mail exchange to Roth, who forwarded it to Murray and Standiford. On March 7, a student sustained a concussion and needed stitches after running into one of the bare concrete walls in the fitness center's basketball court. On March 8, Gonzaga University terminated Martin's employment, citing his failure to correct past performance issues identified in his April 2011

performance review and insubordination. According to Martin, at the meeting wherein he was fired, Standiford told him one reason for his termination was the belief that Martin gave information about student injuries resulting from the lack of padding to the Gonzaga University student newspaper. Martin had submitted an incomplete article from the student newspaper, which quotes Hernandez and Martin, reporting on the lack of wall padding and student injuries. Standiford denied firing Martin because of his complaints about the lack of padding on the basketball court walls.

On March 30, Martin sent a six-page letter to President McCulloh and athletics director Roth. In the letter, he complained that during his employment, he saw "a lack of responsiveness to safety issues at the Rudolf Fitness Center." CP at 102. He claimed that insubordination was a pretext for his termination and that he was really terminated for expressing concern about the university's failure to respond to safety issues at the fitness center. He claimed that Morgan wrongfully accused him of leaking information to the *Gonzaga Bulletin*. He wrote of several safety concerns, though none involved the center's basketball courts. Later in 2012, Gonzaga University installed padding on the walls in the basketball court. In the years leading up to the padding installation, other university employees within the athletic department had advocated to install the wall padding and were not terminated for doing so.

7

After Martin's termination, Gonzaga University provided him with a copy of his personnel file. Martin acknowledged receipt of his personnel file, which included 11 documents, and asked if there were any additional documents in his personnel file that he should be aware of. There is no response in the record. Gonzaga University has explained that it maintains two types of files on employees: a personnel file and an employee relations file.

Martin brought a common law claim for wrongful discharge against Gonzaga University, alleging that the university terminated his employment in violation of public policy for raising concerns about the lack of wall padding for the basketball court. He also brought a statutory claim under RCW 49.12.250, alleging that the university did not provide him with his complete personnel file after his termination. The trial court granted summary judgment to Gonzaga University and dismissed both claims. Martin appealed, and the Court of Appeals, in a split opinion, affirmed the trial court's summary judgment dismissal of the wrongful termination claim, vacated the dismissal of the personnel file claim, and remanded for further proceedings. *Martin v. Gonzaga Univ.*, 200 Wn. App. 332, 375, 402 P.3d 294 (2017). Judge Pennell concurred in affirming the dismissal of the wrongful termination claim but stated that the ground for summary judgment was causation. *Id.* at 375-77. Judge Korsmo dissented with the reversal on the personnel file claim because he believed

that the claim was not justiciable as Martin had no cause of action from the statutes and had not pursued administrative relief. *Id.* at 377-79.

Martin petitioned for review on three issues: (1) the Court of Appeals incorrectly applied the Perritt test to Martin's whistle-blower wrongful discharge claim, (2) assuming the Perritt test does apply, the court misapplied the overriding justification element, and (3) the Court of Appeals improperly relied on the after-acquired evidence doctrine. Gonzaga University cross petitioned for review, arguing that Martin's claim is not justiciable and asked us to adopt the reasoning in Judge Korsmo's dissent. We granted review of Martin's petition for review and Gonzaga University's cross petition. *Martin v. Gonzaga Univ.*, 190 Wn.2d 1002, 412 P.3d 1262 (2018).

## ISSUES

1. Does the Perritt test apply to Martin's wrongful termination claim?

2. Is Martin's personnel file claim justiciable?

## ANALYSIS

"On appeal of summary judgment, the standard of review is de novo, and the appellate court performs the same inquiry as the trial court." *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). We view all facts and reasonable inferences therefrom most favorably toward the nonmoving party, Martin. *Id.* The court should grant summary judgment when "the pleadings, affidavits, and

9

depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*

"A nonmoving party in a summary judgment may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). If Gonzaga University submits adequate affidavits, Martin must then "set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists." *Id.*

### 1. *The Perritt Test*

#### a. *The Perritt Test Does Not Apply to Martin's Whistle-Blower Wrongful Termination Claim*

Martin argues that the Court of Appeals erred by applying the four-part Perritt test to Martin's wrongful discharge claim. Gonzaga University agrees that the Perritt test does not apply in this case. In *Thompson v. St. Regis Paper Co.*, we adopted the tort of wrongful discharge in violation of public policy as a narrow exception to the at-will doctrine. 102 Wn.2d 219, 232-33, 685 P.2d 1081 (1984). We held that to prevail on a cause of action, a plaintiff employee must demonstrate that his or her "discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Id.* at 232. Then, "the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." *Id.* at 232-33. The tort for wrongful discharge in violation of public policy has generally been

10

limited to four scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996) (citing *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989)).

In *Gardner*, this court adopted a four-part framework based on a treatise written by Henry Perritt to resolve a wrongful discharge suit that did not fit neatly into one of those four recognized categories. 128 Wn.2d at 941 (citing HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES (1991)). The Perritt test has four factors: "(1) The plaintiffs must prove the existence of a clear public policy (the clarity element). (2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element). (3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element). (4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element)." *Id.* (emphasis and citations omitted).

However, in *Becker* and *Rose*, we clarified that the Perritt framework should not be applied to a claim that falls within one of the four categories of wrongful

11

discharge in violation of a public policy. *Becker v. Cmty. Health Sys., Inc.*, 184

Wn.2d 252, 258-59, 359 P.3d 746 (2015) ("When the plaintiff's case does not fit

neatly within one of these scenarios, a more refined analysis may be necessary, and

the four-factor Perritt analysis may provide helpful guidance. But such detailed

analysis is unnecessary here." (footnote and citation omitted)); *Rose v. Anderson Hay*

*& Grain Co.*, 184 Wn.2d 268, 277-78, 287, 358 P.3d 1139 (2015) ("We note that in

other instances, when the facts do not fit neatly into one of the four above-described

categories, a more refined analysis may be necessary. In those circumstances, the

courts should look to the four-part Perritt framework for guidance. But that guidance

is unnecessary here."). This court explained the implications of our *Gardner* decision,

which applied the Perritt test:

> In adopting this four-part Perritt analysis, we stated that we did
> not intend to substantively change the wrongful discharge tort. The
> common law already contained clarity and jeopardy elements, so we said
> the "adoption of this test does not change the existing common law in
> this state." *Gardner*, 128 Wn.2d at 941. *Gardner* was a highly unique
> case, and its facts justified a refined analysis. This court's decisions prior
> to *Gardner* remain good law and are merely supplemented by the
> additional guidance provided by the Perritt factors.

*Rose*, 184 Wn.2d at 278. Martin's suit falls into the fourth category, whistle-blowing,

because he alleges that he was fired in retaliation for voicing safety complaints about

the need for wall padding in the basketball courts. Thus, the Court of Appeals erred

by applying the Perritt test instead of using the standard enunciated in *Thompson* and

12

further refined in *Wilmot v. Kaiser Aluminum & Chemical Corp.*, 118 Wn.2d 46, 821 P.2d 18 (1991).

> b. *Under* Thompson *and* Wilmot, *Martin's Claim Does Not Survive Summary Judgment*

Under the correct standard, we affirm the Court of Appeals' ultimate holding that Gonzaga University is entitled to summary judgment on this claim. The elements of wrongful termination in violation of public policy were set forth in *Thompson* and refined by *Wilmot*.

First, Martin has the burden to show that his "discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Thompson*, 102 Wn.2d at 232. "The question of what constitutes a clear mandate of public policy is one of law" and can be established by prior judicial decisions or constitutional, statutory, or regulatory provisions or schemes. *Dicomes*, 113 Wn.2d at 617. Martin advocates that student safety, specifically wall padding in the basketball courts, is a clear mandate of public policy. However, we find no court decision, statute, or regulation that establishes such. Martin has acknowledged that there was no policy or regulation requiring Gonzaga University to install the wall padding. Without roots in regulation or judicial precedent, Martin's mere opinion that wall padding should be installed does not constitute a clear mandate of public policy. Even if Martin truly believed the unpadded walls posed a danger to students, this does not change the analysis, as the focus for whistle-blowing matters is on the employer's level of

13

wrongdoing, not Martin's actions to address what he perceived as wrongdoing. *See Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 671, 807 P.2d 830 (1991). We hold that Martin fails at this first step in the analysis by failing to point to a clear mandate of public policy.

Even if Martin had met the first step, he does not satisfy the second step, which requires the plaintiff to show that the public-policy-linked conduct was a "significant factor" in the decision to discharge the worker. *Wilmot*, 118 Wn.2d at 75. The plaintiff must first establish a prima facie case by producing evidence that the public-policy-linked conduct was a cause of the firing, and may do so by circumstantial evidence. *Id.* at 70. If the plaintiff succeeds in presenting a prima facie case, the burden then shifts to the employer to "articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Id.* (citing 1 LEX K. LARSON, UNJUST DISMISSAL § 6.05[6] (1988)). This is a burden of production, not persuasion. *Id.* ("The employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden."). If the employer articulates such a reason, the burden shifts back to the plaintiff either to show "that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker." *Id.* at 73.

If we assume that Martin meets his initial burden of production, Gonzaga University has met its burden to show legitimate reasons for Martin's dismissal: insubordination and inadequate job performance. Gonzaga University has presented job performance evaluations, declarations, and e-mails showing Martin's consistent problems with following the chain of command and communicating respectfully with his colleagues. There is also ample evidence of Martin's insubordination and disrespectful conduct in close proximity to his termination. A few days before he was terminated, Martin met with Hernandez and Morgan and was essentially reprimanded for insubordination. He was disrespectful during that meeting, arguing and interrupting Hernandez, and then he left in the middle of his shift without receiving permission from Hernandez. He yelled at Radtke, demanding permission to leave, and told another colleague that Hernandez was a pushover. He was subsequently placed on administrative leave for this behavior and then almost immediately violated the terms of his leave by contacting the university's president, even when the president's executive assistant advised him to use the proper chain of command. This evidence satisfies Gonzaga University's burden to show legitimate reasons for Martin's termination.

The burden then shifts back to Martin to show that despite these legitimate reasons for discharge, his whistle-blowing was a significant factor in his termination. There is a paucity of evidence linking Martin's termination with his voicing concerns

about wall padding. The only evidence of Martin voicing such concerns is his own testimony that his proposal raised the issue. Yet, as mentioned, the proposal is not in the record. Even if the proposal mentioned that revenue from pool-related activities could be used for wall padding, as Martin contends, this cannot be correctly characterized as raising student safety concerns regarding the padding. Further, Martin has not pointed to any evidence that his supervisors received his complaints regarding the wall padding, let alone evidence that the university reacted negatively to his suggestions. The record does not support Martin's claim that a significant factor in his termination was his history of voicing student safety complaints about the need for wall padding. Thus, we affirm the Court of Appeals' ultimate holding that Gonzaga University is entitled to summary judgment on Martin's whistle-blower wrongful discharge claim.

### c. Overriding Justification Element and After-Acquired-Evidence Doctrine

Martin claims that the Court of Appeals misapplied the overriding justification element in three ways. We resolve some of these concerns in hopes that it will provide clarity for future litigants.

First, Martin claims that the Court of Appeals erred in granting summary judgment in favor of an employer on the basis of the overriding justification element because this can be done only if the employer first concedes the first three elements of the Perritt test. He interprets our decision in *Gardner* to hold that at summary

16

judgment, an employer must concede the first three elements of the Perritt test before it can assert an overriding justification. However, neither in our adoption of the Perritt test in *Gardner* nor in any subsequent application of it have we held that the overriding justification element comes into play only if the employer concedes the first three elements.

The overriding justification element entails balancing the public policies raised by the plaintiff against the employer's interest. *Gardner*, 128 Wn.2d at 948-49. If "the employer has an overriding reason for terminating the employee despite the employee's public-policy-linked conduct," then it cannot be held liable. *Id.* at 947. Martin contends that if the employer denies that the public-policy-linked conduct caused the dismissal, then the court has not established a public policy interest to balance against the employer's business interest. However, that theory overlooks the possibility of the court resolving the first three elements in favor of the plaintiff employee, which would give the court a public policy interest to balance against the business's stated interest when resolving the fourth element. We decline to accept Martin's contention, as we have never held the employer must concede the first three elements before the court can address the fourth element.

Second, Martin claims that the Court of Appeals erred with regard to the burden of proof for the overriding justification element. In its analysis of this factor, the court questioned which party carried the burden of proof for the element of

overriding justification and did not come to a clear conclusion. Martin argues that this was an error because in *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 358 P.2d 1153 (2015), we said that the burden falls on the defendant employer. He is correct that in *Rickman*, we made it clear where the burden lay. We stated that "[o]nce a plaintiff presents a prima facia case of wrongful discharge in violation of public policy, *the burden of proof shifts to the employer* to show the termination was justified by an overriding consideration." *Id.* at 314 (emphasis added).

Third, Martin argues that the Court of Appeals erred by wrongly applying the after-acquired-evidence doctrine to his wrongful discharge claim. The Court of Appeals resolved the overriding justification element by posing eight questions to consider. *Martin*, 200 Wn. App. at 359-373. The second question asked whether the employer must be motivated by the overriding justification at the time the employee is discharged in order to avoid liability. *Id.* at 362. The court answered this question in the negative, depending primarily on the after-acquired-evidence doctrine. It reasoned that

> [t]he university may avoid liability if insubordination constitutes a justifying reason under the law and overrides the advocacy of safety concerns, regardless of whether insubordination motivated the firing.
>
> We secure our decision, freeing the employer from showing the overriding justification prompted its decision to fire, primarily on the "after-acquired evidence" doctrine. This doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later discovers evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct.

18

> *Lodis v. Corbis Holdings, Inc.*, 192 Wn. App. 30, 60, 366 P.3d 1246
> (2015), *review denied*, 185 Wn.2d 1038, 377 P.3d 744 (2016); *Janson v.*
> *North Valley Hospital*, 93 Wn. App. 892, 900, 971 P.2d 67 (1999*). If the*
> *employer may limit its liability with evidence of insubordination*
> *discovered after the termination from employment, the employer should*
> *be able to limit its liability with evidence known at the time of the*
> *discharge, even if the employer utilized only public-policy-defying*
> *grounds.* We discern no reason to distinguish the two factual scenarios
> for purposes of employer liability. Under each circumstance, the
> employee's misconduct retrospectively substantiated the termination.

*Id.* at 362-63 (emphasis added). Martin takes issue with applying the after-acquired-evidence doctrine because this court has never done so in the wrongful discharge context and because the after-acquired-evidence doctrine limits damages and remedies rather than liability.

Martin is correct that there is no case law to support applying the after-acquired-evidence doctrine to a wrongful discharge claim. There is no reasoning within our common law wrongful discharge decisions or in our application of the Perritt test that supports the Court of Appeals' conclusion that an overriding justification can limit liability "regardless of whether [the overriding justification] motivated the firing." *Id.* at 363. He is also correct that the doctrine limits the damages an employee may recover and does not limit liability as a matter of law. *Lodis*, 192 Wn. App. at 60. In addition to this significant difference, the after-acquired-evidence doctrine requires that the employer prove that the wrongdoing was of such severity that it would have terminated the employee on the newly discovered evidence alone. *Id.* (quoting *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S.

19

352, 362-63, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995)). This does not comport with the balancing posture of the overriding justification element. We hold that the after-acquired-evidence doctrine does not apply to the overriding justification element of the Perritt test.

2. *Martin's Personnel File Claim Is Not Justiciable*

The last issue this court must address is the one presented in Gonzaga University's cross petition for review: whether Martin's claim regarding his personnel file is justiciable. Martin claimed at the trial court that Gonzaga University failed to provide him a complete copy of his personnel file in violation of RCW 49.12.250. While the trial court granted summary judgment to Gonzaga University on this claim, the Court of Appeals reversed, finding there were unanswered factual questions requiring further proceedings at the trial court. *Martin*, 200 Wn. App. at 333. Judge Korsmo dissented on this issue, concluding that the claim is not justiciable because the relevant statutes "did not create a judicial cause of action" and the Department of Labor and Industries (DLI) is the "first line defender" of rights contained in the statute. *Martin*, 200 Wn. App. at 377-78. Gonzaga University advocates that we adopt Judge Korsmo's conclusion and reasoning and reverse the Court of Appeals' holding on this claim.

The statutes at issue, RCW 49.12.240 and RCW 49.12.250, are a part of the industrial welfare chapter of the Revised Code of Washington. DLI has enforcement

authority over this chapter. RCW 49.12.033; RCW 43.22.270(5). As Judge Korsmo concluded, Martin would first have to pursue an administrative request through DLI before seeking a judicial remedy from the court. *Martin*, 200 Wn. App. at 378. There is nothing in the record to show that Martin has brought his request to DLI. Thus, we reverse the Court of Appeals' holding on the personnel file claim and hold that Gonzaga University is entitled to summary judgment on this claim.

## CONCLUSION

We reverse the Court of Appeals' reasoning on the wrongful discharge claim because it erred by applying the Perritt framework. However, we affirm the court's ultimate holding that Gonzaga University is entitled to summary judgment on this claim. We reverse the Court of Appeals' holding on the personnel file claim because Martin's claim is not yet justiciable. We hold that Gonzaga University is entitled to summary judgment on this claim. Thus, both of Martin's claims are dismissed.

*Martin v. Gonzaga University*
No. 95269-8

_____
Owens, J

WE CONCUR:

_____
Fairhurst, C.J.

_____

_____
Madsen, J., *result only*

_____
Stephens, J.

_____
Wiggins, J.

_____
González, J., *Result only*

_____

_____
Yu, J

22