IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SHAHROOZ JAHANBIN,<br><br>Appellant,<br><br>v.<br><br>THE BOEING COMPANY, ERIN KELLY, an individual, NATHAN THOMAS, an individual, and RICH KAWAGUCHI, an individual,<br><br>Respondents. | No. 86522-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Shahrooz Jahanbin started working for The Boeing Company (Boeing) in 2009. In 2019, the Federal Bureau of Investigation (FBI) notified Boeing that it had information suggesting Jahanbin was using his Boeing computer to share information with non-Boeing personnel. After Boeing conducted a lengthy investigation, which included installing monitoring software on Jahanbin's work computer, Boeing terminated Jahanbin's employment for misconduct in 2021. Jahanbin filed suit against Boeing alleging disparate treatment, discriminatory discharge, and wrongful termination in violation of public policy. The trial court granted summary judgment in Boeing's favor and dismissed Jahanbin's claims. On appeal, Jahanbin challenges the trial court's dismissal of his claims on summary judgment. We affirm.

FACTS

Shahrooz Jahanbin, a United States citizen born in Iran, began working for Boeing as an aircraft mechanic in 2009. Jahanbin then took a position as a Structural Analysis Engineer and progressed to become a Structural Analysis Engineer Level II. In 2017, Jahanbin was asked to join the "Next Generation Quality team" as an Experienced Structural Analysis Engineer for the 777X program, whose goal was to streamline efficiency. Around this time, Jahanbin raised concerns to his supervisors that removing inspection procedures to save costs would lead to violations of federal law and could lead to premature defects that could jeopardize aircraft safety. He and other employees who also had concerns with the change in procedure attempted to elevate those concerns up the chain of command. For example, Jahanbin gave presentations on the issues and deficiencies he perceived. However, their concerns were dismissed.

While on the Next Generation Quality team, Jahanbin developed four technical memoranda, proposing the invention of an "alternative method to address in-service inspections of 777X crucial components that were removed during the manufacturing process." Boeing sought patents of Jahanbin's inventions. Despite vocalizing concerns, Jahanbin received several positive evaluations from his relevant managers between 2012 and 2018 and was nominated for an "appreciation award" based on his inventions.

Subsequently, Jahanbin left the Next Generation Quality team and took a different position as a Structural Engineer. In 2019, he was promoted to Flight Operational Manager, a position in which he was "responsible for preflight and delivery of 777X airplanes." In May 2020, Jahanbin took a position as a Senior Safety Engineer, which required him to communicate with the Federal Aviation Administration (FAA). He

again tried to speak out about his concerns with the change in safety procedures, but his senior manager dismissed his concerns.

In April 2019, Boeing's Strategic Intelligence team, which monitors, analyzes, and investigates "potential insider threats" to Boeing, received information from the FBI that Jahanbin had used his Boeing-issued computer to "share aviation information with non-Boeing personnel, and more specifically, with non-identified Iranian individuals in violation of OFAC [(Office of Foreign Assets Control)] sanctions." Independently, another Boeing employee on the Strategic Intelligence team "discovered anomalous data and activity associated with Mr. Jahanbin's use of the Boeing IT network." Erin Kelly, an Insider Threat Specialist with the Strategic Intelligence team, began investigating Jahanbin in April 2019. During this time, Kelly discovered that Jahanbin downloaded unapproved software onto his Boeing computer, including Zoom, Telegram, Microsoft Teams and WhatsApp. This led Kelly to install a forensic monitoring tool (FMT) that "capture[d] screenshots, every three seconds, of Mr. Jahanbin's activities" on Jahanbin's Boeing-issued computer.

After using the FMT between May 2020 and November 2020, Kelly concluded that Jahanbin "repeatedly violated Boeing Procedures and Information Security Standards." In May and June 2020, the FMT captured information that showed Jahanbin copying folders labeled as "Boeing Proprietary" into a draft in his personal email account, responding to an email in Farsi, accessing a restricted database, and copying a screenshot of aircraft information into another email draft. In August 2020, the FMT captured Jahanbin downloading five export-controlled "Aircraft Illustrated Parts Catalog" manuals and uploading them to a third-party storage site. In October and

November 2020, the FMT captured Jahanbin recording meetings between Boeing and the FAA, which he saved on the unapproved Telegram application.

On December 3, 2020, the FBI conducted a search of Jahanbin's house and seized his Boeing laptop and other devices. Subsequently, on December 4, 2020, Jahanbin's then-manager, Nathan Thomas, placed Jahanbin on a leave of absence, as instructed by Boeing's Human Resources department. Boeing then interviewed Jahanbin about his alleged misconduct.

The Boeing Employee Corrective Action Review Board (ECARB) addresses employee misconduct that may warrant discharge. A Special Action Review (SAR) committee is utilized in situations where "an employee is accused of particularly egregious conduct that raises special concerns for Boeing," such as insider threats. Boeing assembled the SAR committee to address Jahanbin's misconduct and concluded that his "actions were egregious and a clear violation of Boeing policies." After considering the Employee Corrective Action Process Requirements for 2H violations—the misuse or failure to protect information or intellectual property—and 2F violations—creating an unacceptable liability or potential liability—the SAR committee determined that terminating Jahanbin was appropriate.

In January 2021, Anthony Garcia, counsel for Boeing, authored a recommendation to the ECARB, summarizing the findings from the investigation that Jahanbin "misappropriated Boeing proprietary information, supplied Boeing information to non-Boeing personnel without authorization, downloaded unauthorized applications to his Boeing laptop, recorded Boeing meetings with the [FAA] without the participants' consent, and was not credible during his interview in the investigation." On January 28,

2021, his manager, Thomas, informed Jahanbin that his employment was terminated effective immediately and provided him with a copy of the Employee Corrective Action Memo, which explained that his "actions have created an unacceptable liability" and that such serious violations were the cause of his discharge.

In October 2022, Jahanbin filed a lawsuit against Boeing, alleging wrongful discharge in violation of public policy, discrimination based on his nationality, retaliation, and creation of a hostile work environment pursuant to the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. Boeing filed a CR 12(b)(6) motion to dismiss the case for failure to state a claim, which the court denied.[1] After a series of discovery motions, which resulted in a protective order for Boeing, Boeing filed a motion for summary judgment in October 2023. Jahanbin filed a response and also requested a CR 56(f) continuance so he could seek comparator data to develop his theory that his discharge was pretext for discrimination. After a hearing on November 3, without explicitly ruling on the CR 56(f) motion, the court granted summary judgment in favor of Boeing and dismissed each of Jahanbin's claims. Jahanbin filed a motion for reconsideration, which the court denied. The trial court also denied Boeing's motion for attorney fees. Jahanbin timely appeals the grant of summary judgment in favor of Boeing and denial of reconsideration.

## DISCUSSION

Jahanbin challenges the trial court's grant of summary judgment in favor of Boeing, arguing that there are genuine issues of material fact regarding his claims for

---

[1] The parties filed dueling motions for protective orders and the court granted Boeing's. Jahanbin filed a motion for sanctions and delay of summary judgment which the court denied. The court also denied Jahanbin's motion to compel interrogatories.

disparate treatment, discriminatory discharge, and wrongful discharge in violation of public policy.[2] He also argues that the trial court abused its discretion in declining to grant him a CR 56(f) continuance so he could complete discovery.[3] We conclude the trial court did not err in granting summary judgment or in denying a continuance.

I. WLAD Claims

We review orders granting summary judgment de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is proper when "there is no genuine issue as to any material fact," meaning the moving party is entitled to judgment as a matter of law. CR 56(c). A "material fact" exists when such fact impacts the outcome of the litigation. Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). There is a genuine issue of material fact when "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Keck, 184 Wn.2d at 370. The moving party can submit affidavits demonstrating an absence of a material issue or can demonstrate that the nonmoving party lacks competent evidence to support an essential element of their claim. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989). We consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Id. When the moving party satisfies the initial burden, the burden then shifts to the nonmoving party to demonstrate the existence of an element essential

---

[2] While Jahanbin assigns error to the court's grant of summary judgment dismissing all of his claims, on appeal, he provides argument only as to these three claims. When the basis for an assignment of error "is not stated nor argued nor is there any reference to decisional or statutory law bearing upon the issue," the assignment of error is waived. Puget Sound Plywood, Inc. v. Mester, 86 Wn.2d 135, 142, 542 P.2d 756 (1975). Thus, he has waived appeal of the dismissal of his claims for retaliation and hostile work environment.

[3] Jahanbin assigns error to the trial court's denial of his motion for reconsideration but does not provide argument or citations to authority. Thus, Jahanbin has waived any error regarding the order denying the motion for reconsideration.

to their case of which they will bear the burden of proof at trial. Id. at 225. The failure to make such showing will result in the trial court granting summary judgment. Id.

The WLAD protects "[t]he right to be free from discrimination because of race, creed, color, national origin." RCW 49.60.030(1). In particular, WLAD contemplates the "right to obtain and hold employment without discrimination," RCW 49.060.030(1)(a), which prohibits an employer "from discharging any employee on the basis of a protected characteristic." Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526, 404 P.3d 464 (2017).

As direct evidence of discrimination is rare, "plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action." Id. Thus, the Washington Supreme Court has adopted the three-part McDonnell Douglas[4] burden-shifting framework. Id. at 527. First, the employee must establish a prima facie case of discrimination, which, if satisfied, creates a rebuttable presumption of discrimination. Id. Second, the burden shifts to the employer to " 'articulate a legitimate nondiscriminatory reason for the adverse employment action.' " Id. (quoting Scrivener v. Clark Coll., 181 Wn.2d 439, 446, 334 P.3d 541 (2014)). Finally, the burden shifts back to the employee to demonstrate the employer's proffered nondiscriminatory reason was pretext. Id. An employee shows that the proffered reason is pretext when it "has no basis in fact, is an unreasonable ground upon which to base the decision, or was not a motivating factor in employment decisions for other similarly-situated individuals." Williams v. Dep't of Soc. & Health Servs., 24 Wn. App. 2d 683, 700, 524 P.3d 658 (2022). An employee can also satisfy their burden at the final step by offering evidence that creates a genuine issue of

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

fact that the employer's reason was a pretext for discrimination or that its reason was legitimate but the employer was substantially motivated by discrimination. <u>Mikkelsen</u>, 189 Wn.2d at 528.

Jahanbin contends Boeing subjected him to disparate treatment based on his national origin because it monitored him for seven months when it first learned of his alleged misconduct instead of giving him a written warning.[5] He further contends his discharge was unlawfully based on his national origin.

To establish a prima facie case of disparate treatment, the plaintiff must show that they were (1) a member of a protected class, (2) suffered a "tangible adverse employment action," and (3) "that the action occurred under circumstances that raise a reasonable inference of unlawful discrimination and that the [plaintiff] was doing satisfactory work." <u>Marin v. King County</u>, 194 Wn. App. 795, 808-09, 378 P.3d 203 (2016). Jahanbin contends that he can make the prima facie showing of discrimination for both his disparate treatment claims based on monitoring and for discriminatory discharge. While Boeing agrees that he can establish the first element, as Jahanbin is a member of a protected class, it disagrees that he can satisfy the other prima facie elements.[6]

---

[5] After oral argument, Boeing filed a statement of additional authorities with cases supporting its argument that (1) Jahanbin's work was not satisfactory; (2) Jahanbin failed to address the prima facie case on reply and conceded it; and (3) it supplied adequate comparator evidence. Jahanbin responded that he did not concede the prima facie case, as he addressed it in his opening brief. Jahanbin filed a motion to strike Boeing's additional authorities, arguing that the cases Boeing cited therein should be stricken because they were available at the time it filed its response brief. We agree with Jahanbin that he did not concede the prima facie case. But as Boeing's statement of additional authorities complies with RAP 10.8, we deny Jahanbin's motion to strike it.

[6] Boeing claims he was not doing satisfactory work because he engaged in misconduct. However, this argument improperly collapses the inquiry. Instead, the relevant time period is whether *before* the allegedly adverse action, he was performing satisfactory work.

As to his disparate treatment claim, Jahanbin argues that he was treated less favorably than other nonprotected employees because he did not receive a written warning. Instead, Boeing "covertly monitored him for over seven months" based on his use of Farsi in emails before taking disciplinary action.

As Boeing points out, "the gist" of this disparate treatment claim is that he should have been warned rather than investigated. But proof of an actionable adverse action requires showing a " 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " Marin, 194 Wn. App. at 808 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Jahanbin cannot meet his burden of establishing a prima facie case of disparate treatment solely based on the failure to receive a written warning. A grant of summary judgment is proper in the context of WLAD when "the plaintiff fails to raise a genuine issue of fact on one or more prima facie elements." Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 777, 249 P.3d 1044 (2011). Boeing was entitled to judgment as a matter of law on Jahanbin's WLAD claim based on monitoring.

As to his discriminatory discharge claim, the parties disagree on the third prima facie element—in particular, whether he had been doing satisfactory work prior to his discharge. Jahanbin contends that his work had always been satisfactory, noting that he had passed various background checks and had been a valuable employee. The record indicates that even during the time of Boeing's investigation, Jahanbin received a performance review in July 2020 stating that he "listens and demonstrates understanding; . . . [is] able to communicate with a diverse audience," and "[d]eals with

others in a fair honest, and straightforward manner . . . takes responsibility for failures and shares credit for successes; uses appropriate discretion and is sensitive to confidentiality," and "[d]elivers products and services that consistently meet or exceed expectations."

Boeing does not dispute that Jahanbin continued to receive positive reviews but instead asserts that Jahanbin's work could not have been satisfactory if he "admit[ted] to misconduct that violated Boeing policies and Washington law." Boeing misconstrues this element. For a prima facie case, Jahanbin need show only that *before* the allegedly adverse action—for this claim, the discharge—he was performing satisfactory work, other than the evidence of misconduct that Boeing claims led to the discharge. See, e.g., Mackey v. Home Depot USA, Inc., 12 Wn. App. 2d 557, 459 P.3d 371 (2020) (plaintiff established a prima facie case even though defendant submitted evidence that the plaintiff violated company policy, as plaintiff submitted evidence that her work was satisfactory); Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 84 P.3d 1231 (2004) (plaintiff who had been satisfactorily performing *before* she was injured and filed for workers compensation, then was terminated shortly after return to work, established a prima facie case). Therefore, Jahanbin has met his initial burden of establishing a prima facie case that his discharge was discriminatory.

At the second step of the McDonnell Douglas test, the burden shifts to Boeing to provide evidence of a legitimate, nondiscriminatory reason for the discharge. Boeing's stated reason for discharge was Jahanbin's misconduct. After being alerted by the FBI, Boeing monitored Jahanbin "to examine [his] activity on his Boeing laptop." Kelly explained that she "assumed responsibility for reviewing Mr. Jahanbin's activity based

on both the FBI's notice and this new report of anomalous network activity to determine if there was evidence to validate or negate the allegation," that Jahanbin was using "a communications software application to share aviation information with non-Boeing personnel, and more specifically, with non-identified Iranian individuals in violation of OFAC sanctions." After investigating, Kelly found that Jahanbin had downloaded unapproved software onto his Boeing-issued computer and "had engaged in further conduct, which further suggested to me that efforts should be made to obtain more detailed information about his activities," prompting the installation of the FMT software onto Jahanbin's Boeing-issued computer. Boeing's Report of Investigation detailed Jahanbin's misconduct, including that Boeing discovered he had been saving confidential information onto his personal email account and that he admitted to exporting sensitive Boeing documents to his third party storage site and recording confidential meetings. Kelly stated in her memorandum to the SAR committee that Jahanbin was "not truthful during his interview."

As Boeing has satisfied its burden of providing evidence that it had a legitimate, nondiscriminatory reason for discharging Jahanbin, the burden shifts back to Jahanbin to provide evidence that, if believed, raises a question of fact as to whether his misconduct was pretext for discrimination. "One test for pretext is whether (1) an employee outside the protected class (2) committed acts of comparable seriousness (3) but was not demoted or similarly disciplined." Johnson v. Dep't of Soc. & Health Servs., 80 Wn. App. 212, 227, 907 P.2d 1223 (1996).

Jahanbin points to a document in the record that includes comparator data on the discipline received by employees who committed 2H and 2F violations, but the

document does not provide any information on their race or national origin. An employee commits a 2F violation by taking "any action or lack of action that has caused a financial or legal liability or the potential for such for the company or has created the expectation of liability for the company," with an aggravating factor for when the violation poses "significant liability."[7] A 2H violation includes "[f]ailure to protect; damage; unapproved access, unapproved possession, disclosure, distribution, or misuse of information or other intellectual property of the company, its employees, [etc.]," with an aggravating circumstance stating that "an ECARB review for potential discharge will occur when there is an actual loss of information, trade secret protection, rights to intellectual property; and/or employee actions jeopardize Boeing's ability to acquire leverage, or protect intellectual property; misuse of competitor sensitive information."

Here, the evidence shows that the 90 employees who committed 2H violations—misuse or failure to protect information or intellectual property—received written warnings and only three were discharged. However, 18 employees who committed 2F violations—creating an unacceptable liability or potential liability—were discharged, while only one received a written warning. This information suggests that written warnings were not as common for 2F violations as they were for 2H violations. But as Boeing points out, Jahanbin "provides no evidence about whether those others [who received warnings] are outside his protected class, no evidence showing they are similar to Jahanbin in terms of job held, and no evidence showing they are similar to Jahanbin in terms of the seriousness or amount of misconduct."

---

[7] This document includes a separate column for "TOFW," however the record does not include a key or indicate what type of action this is, and Jahanbin does not explain it.

Jahanbin also contends that even though Boeing terminated him after concluding that his conduct created an "unacceptable liability," the fact that it monitored him as it was occurring shows Boeing's stated reason for discharge was pretextual. In particular, he contends that had his activities created such an unacceptable risk, Boeing should have stopped or warned him earlier, but instead, Boeing exaggerated its concern that he was disclosing proprietary information to sanctioned entities. He claims that exaggeration is evidence of pretext, pursuant to several federal cases.[8] He points to the fact that Boeing never filed a complaint against him for misappropriation of trade secrets and that he was never arrested or charged for disclosing information to sanctioned entities, evidence that he suggests could lead a jury to "find that Boeing was substantially motivated by Jahanbin's race, national origin, and use of Farsi" when it conducted an active insider threat investigation and subsequently discharged him.

In response, Boeing argues that Jahanbin's misconduct was not exaggerated but was in fact "egregious." It points to evidence that Jahanbin admitted to "moving the Boeing documents" to a third-party cloud storage account, as well as to recording "conversations between the FAA and Boeing personnel . . . [wherein] the participants did not authorize him to do so." Jahanbin also "admitted disclosing Boeing information about Ukrainian Airlines cockpit voice data recorders to the family members of the victims" of a plane crash. Further, the Boeing Report of Investigation summarizes Jahanbin's alleged policy violations:

---

[8] Appellant cites Vaughn v. Woodforest Bank, 665 F.3d 632, 639-40 (5th Cir. 2011), in which the court reversed summary judgment based on evidence that the defendant exaggerated its concern over the plaintiff's unsatisfactory conduct and statements at work. Appellant also cites Plotke v. White, 405 F.3d 1092, 1106 (10th Cir. 2005), in which the court noted that a jury could infer that the plaintiff's employer discriminated against her by reassigning her after it exaggerated an incident where the plaintiff improperly filed travel documents.

Jahanbin did not adhere to the expected behaviors for Boeing employees when he misappropriated BPI and Export Administration Regulations (EAR) data. Jahanbin stored five Boeing Manuals marked Boeing Proprietary [ ], unpublished work, and copyright to his [third party] provided cloud storage.

. . . .

Jahanbin also stored Boeing information in draft emails located in his personal Gmail accounts, and evidence suggests that non-Boeing persons had access to the draft emails and Boeing data. Jahanbin also violated Boeing Information Security Policy Standards and Boeing Computing Security Standards when he installed several external communication tools—Telegram, Whatsapp, Microsoft Teams, and Zoom—not approved for Boeing business use—to his Boeing-issued laptop.

. . . .

Jahanbin was discovered to have surreptitiously recorded four joint-Boeing and FAA aviation safety related meetings without permission from either Boeing or the FAA.

Jahanbin also points to Boeing's Report of Investigation, which noted that he had "multiple documents written in Farsi script" and that he "was emailing professors located in Iran." He claims this report supports his claim that his discharge was motivated by his national origin and use of Farsi. As other evidence of discrimination, Jahanbin claims that after covertly monitoring him, Boeing contacted the FBI, who raided his home. However, in support of this contention, he cites only to his declaration, which does not indicate any connection between Boeing's investigation of him and the FBI's raid of his home. Further, he asserts that Kelly "admitted Boeing felt a need to investigate him for fear he was communicating with 'sanctioned entities.' " Yet, when read in full, the transcript shows Kelly stating only that "Boeing has a responsibility to make sure that there is no sanctioned information that is provided to sanctioned entities." Jahanbin does not cite to any evidence in the record to indicate that the FBI raid of his home was precipitated by Boeing's investigation of him or that any nonprotected employees were

14

not similarly investigated for similar types of misconduct. Jahanbin does not explain how his declaration demonstrates that he was disparately treated by Boeing's monitoring.

Finally, as evidence of animus, he points to questions from his then-manager, Thomas, about what food he eats " 'back home in [the] middle east.' " This is insufficient to create a question of fact as to the pretext because the decision to terminate him was made by the SAR, not by Thomas.

Thus, absent any evidence that the proffered reason for his discharge had "no basis in fact," was "an unreasonable ground upon which to base the decision," see Williams, 24 Wn. App. 2d at 700, or that other employees who committed similar misconduct were not similarly discharged, Jahanbin cannot meet his burden of producing evidence that this discharge was pretext for discrimination. Therefore, we conclude that, considering all evidence and inferences in Jahanbin's favor, the trial court did not err in dismissing Jahanbin's discriminatory discharge claim.

II.  Wrongful Discharge in Violation of Public Policy

Jahanbin also contends that he presented an issue of fact regarding whether Boeing wrongfully discharged him because he spoke "out for years against Boeing's decisions to strip safety protections from its manufacturing process." Boeing argues that Jahanbin cannot demonstrate a clear public policy or that anyone involved in his termination was aware of his "alleged protected activity." We agree with Boeing.

Washington recognizes the tort of wrongful discharge in violation of public policy as an exception to the at-will employment doctrine. Martin v. Gonzaga Univ., 191 Wn.2d 712, 722-23, 425 P.3d 837 (2018). A terminated employee can establish a claim for wrongful discharge in violation of public policy by proving that they did one of the

following: (1) refused to commit an illegal act; (2) performed a public duty or obligation, e.g. jury duty; (3) exercised a legal right or privilege; and (4) were retaliated against for reporting employer misconduct, i.e. whistleblowing. Id. at 723.

Jahanbin contends that he "engaged in protected activities, akin to whistleblowing for years, by openly complaining to many supervisors within Boeing that the company's cost-cutting decisions to systematically remove safety inspections, violated federal aviation standards." To prevail, Jahanbin must identify a clear public policy, demonstrate that his discharge was likely motivated by his action in pursuit of that public policy, and show that Boeing could not offer an overriding reason for his discharge. See Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 231-33, 685 P.2d 1081 (1984).[9]

The first Thompson element, a clear mandate of public policy, is "established by prior judicial decisions or constitutional, statutory or regulatory provisions or schemes." Martin, 191 Wn.2d at 725. Jahanbin argues that air safety is heavily regulated, pointing to 42 U.S.C. § 7572 and 14 C.F.R. § 21. He also relies on the fact that federal case law recognizes "an 'overriding public policy' in 'promoting aviation safety,' " specifically citing Sikkelee v. Precision Airmotive Corp., 822 F.3d 680, 707-08 (3d Cir. 2016)). However, Jahanbin does not articulate how these federal laws, regulations and cases establish a

---

[9] Jahanbin's argument is based on the "Perritt" framework, as set out in Henry H. Perritt, Jr., Workplace Torts: Rights and Liabilities (1991). See Martin, 191 Wn.2d at 723-24. This framework requires the employee to prove (1) the existence of a clear public policy, (2) that discouraging the employee's conduct would jeopardize that public policy, (3) that the employee's public policy-based conduct caused their dismissal, and (4) that the employer cannot offer an overriding reason for the dismissal. Id. at 723. However, courts apply the Perritt framework only if a claim is not based on one of the four general circumstances. Id. at 724. Here, as Jahanbin's claim is based on the fourth general category, reporting employer misconduct, we instead apply the standard from Thompson.

clear public policy specifically as to his alleged whistleblowing activities—i.e., reporting and speaking about Boeing allegedly stripping safety inspections to save costs.

For example, 42 U.S.C. § 7572(a), a subpart of the federal chapter on "Air Pollution Prevention and Control," merely provides the federal Secretary of Transportation with authority to "prescribe regulations to insure compliance" with air pollution standards articulated pursuant to 42 U.S.C. § 7571. Similarly, 14 C.F.R. § 21 is a broad category of regulation describing "Certification Procedures for Products and Articles," which covers hundreds of subsections. And finally, while Sikkelee does state that promoting aviation safety is an overriding public policy, it is factually and procedurally distinct. There, the plaintiff filed a wrongful death action alleging various state law claims and violation of FAA regulations. Sikkelee, 822 F.3d at 685. The district court granted summary judgment on the plaintiff's design defect claims, concluding that federal law preempted a state cause of action. Id. at 686-87. However, on appeal, the Third Circuit explained that Congress had not created a federal standard of care for injuries related to design defect and that state standards of care were not preempted. Id. at 708-09. Thus, the Sikkelee court concluded that preserving state tort law standards of care does not alter remedies for people injured by aviation-related design defects but "furthers an overriding public policy and one we conclude is consistent with the Federal Aviation Act, FAA regulation, GARA [(General Aviation Revitalization Act)] and decisions of the Supreme Court and our sister Circuits: promoting aviation safety." Id. at 707-08.

The authority Jahanbin identified does not support his claim that there is a clear public policy protecting his reports of safety issues. Instead, his claim is based on his

own opinions as to what should constitute proper procedure. "Mere opinion" as to the appropriate safety measures "does not constitute a clear mandate of public policy." Martin, 191 Wn.2d at 725 (although the plaintiff argued "that student safety, specifically wall padding in the basketball courts, is a clear mandate of public policy" there were no statutes, regulations, or caselaw that supported his position). Here, as in Martin, Jahanbin's claim amounts to his opinion, which is not a clear public policy. We conclude that Jahanbin has failed to satisfy his burden of identifying a clear public policy that was furthered by his complaints about Boeing stripping safety inspections to save costs.

We also conclude that Jahanbin cannot satisfy his burden of demonstrating that his discharge was motivated by his vocalizations about safety inspection procedures because of the public scrutiny Boeing faced relating to "the 737 MAX groundings." He asserts his statements "substantially motivated [Boeing] to rid itself of a whistleblowing employee who had shown a willingness to potentially speak outside of the company."[10] But Jahanbin cannot demonstrate that anyone on the SAR team knew of his concerns, much less that they were motivated by them.

Generally, a plaintiff must show a connection between their complaints and the discharge, such as proximity in time and that the decisionmaker was aware of the complaints. See Cornwell v. Microsoft Corp., 192 Wn.2d 403, 413, 430 P.3d 229 (2018) (refusing to adopt a "general corporate knowledge" standard and instead applying an

---

[10] Jahanbin's complaint includes a claim for retaliation pursuant to WLAD, chapter 49.60 RCW and a claim for wrongful discharge in violation of public policy. On appeal, he focuses on his claim for wrongful discharge in violation of public policy for his whistleblowing activities. In analyzing the causation element of the Perritt framework, he cites to Currier v. Northland Servs., Inc., 182 Wn. App. 733, 747, 332 P.3d 1006 (2014), where the court explained that an employee establishes a rebuttable presumption of retaliation by demonstrating they engaged in a statutorily protected activity that their employer knew about, and they were subsequently discharged. However, Currier involved a WLAD retaliation claim and not a wrongful discharge in violation of public policy retaliation claim.

actual knowledge or "knew or suspected" standard in the WLAD retaliation context). For example, in Mackey, the plaintiff filed a claim of wrongful discharge in violation of public policy alleging that she was retaliated against for complaining to her store manager about her coworker's behavior. 12 Wn. App. 2d at 565-67. There, the store manager both informed the plaintiff that she was being terminated and prepared her notice of termination, which created an inference that the store manager was at least one of the people who decided to terminate the plaintiff. Id. at 576-77. Further, as the plaintiff was terminated 12 days after she complained directly to the store manager, "[t]his proximity in time between the complaint and the termination is sufficient to create a reasonable inference" that the plaintiff's complaint was a significant factor in her termination. Id. at 579-80.

Here, unlike in Mackey, beyond mere assertions that his managers and supervisors knew of his concerns with the safety inspection procedures and dismissed them, Jahanbin does not point to any record evidence that his concerns raised two years prior to Kelly's investigation were part of the investigation, were presented to the SAR committee, or were considered by the SAR committee at all. Therefore, we conclude that when considering all evidence and inferences in Jahanbin's favor, he has failed to satisfy his burden under Thompson to show that his discharge may have been motivated by reasons contrary to clear public policy. Thus, the trial court properly dismissed Jahanbin's claim of wrongful discharge in violation of public policy.

III. CR 56(f) Request to Continue Summary Judgment

Jahanbin argues that the trial court abused its discretion in declining to continue the summary judgment hearing to allow him to obtain "relevant comparator data" that

would have demonstrated pretext for discrimination. In particular, he argues that he needed to complete several depositions of Boeing employees and that Boeing redacted and withheld comparator data.

A court has authority to continue a hearing on a motion for summary judgment when the party opposing summary judgment demonstrates that it cannot present affidavits to support its opposition. CR 56(f). A court may deny a motion for continuance when the party opposing summary judgment (1) does not have a good reason for the delay in obtaining evidence, (2) does not indicate what evidence would be established by additional discovery, or (3) the evidence does not raise a genuine issue of material fact. Modumetal, Inc. v. Xtalic Corp., 4 Wn. App. 2d 810, 832, 425 P.3d 871 (2018). A court can deny a continuance if "[o]nly one of the qualifying grounds" are met. Gross v. Sunding, 139 Wn. App. 54, 68, 161 P.3d 380 (2007). We review a trial court's decision on a request to continue a summary judgment for an abuse of discretion, meaning its decision is based on untenable or unreasonable grounds. Modumetal, 4 Wn. App. 2d at 832.

However, to prevail under CR 56(f), Jahanbin needed to point to evidence that he could not have previously attained that suggests Boeing's proffered reasons for his treatment were pretexts for discrimination based on his national origin. Jahanbin first argues that he needed to finish depositions of Erin Kelly and Boeing's CR 30(b)(6) deponent, Anthony Garcia, and conduct a deposition of Rich Kawaguchi. However, Jahanbin fails to show good reason for the delay. But the record shows that Jahanbin prematurely ended the deposition of Kelly, conducted two depositions of Garcia, and failed to reschedule a deposition with Kawaguchi. The cases Jahanbin cites in support

20

of this assignment of error are distinguishable, because the delay in those cases was due to the plaintiff's substitution of counsel, who needed time to respond to the claims. See Coggle v. Snow, 56 Wn. App. 499, 508, 784 P.2d 554 (1990); Butler v. Joy, 116 Wn. App. 291, 299-300, 65 P.3d 671 (2003). By contrast, here, Jahanbin has not indicated that he substituted his counsel or that his counsel was dilatory.

Further, Jahanbin fails to state specifically what testimony Kelly, Garcia, or Kawaguchi would provide that would create a genuine issue of material fact as to pretext, or why he failed to ask Kelly or Garcia in their previous depositions the necessary questions to obtain that information. Unlike in Coggle, 56 Wn. App. at 507-08, where the court concluded that the trial court abused its discretion in denying the plaintiff's CR 56(f) request to continue because the affidavit he intended to submit would rebut the defendant's testimony, here, Jahanbin has not identified how the outstanding depositions would create a genuine issue of material fact that his treatment and discharge was pretext. Therefore, he has not satisfied the CR 56(f) requirements as to the depositions.

Jahanbin also argues that he needed to meet and confer about Boeing's failure to respond to his third set of interrogatories and requests for production (RFP).[11] Jahanbin notes the data he had already received omitted contact information, disciplinary files, and investigative files. He identifies specific comparator data, namely disciplinary and investigative files, that could raise a genuine issue of material fact if it demonstrates an employee outside of a protected class who committed similar misconduct was not similarly disciplined. However, he fails to demonstrate any good

---

[11] The record does not include the third set of interrogatories and RFPs.

21

reason for delay. He claims that the delay was due to Boeing's refusal to meet for a CR 26(i) conference.

But the record does not support this contention. In early September 2023, Jahanbin attempted to set up a CR 26(i) meet and confer, alleging that Boeing's response to his requests for admission (RFA) and RFPs were deficient.[12] Boeing responded that it would not participate in the meeting because it believed that Jahanbin had not properly identified "the specific deficiency concerns" of their responses, so that it could consider the issues and prepare to address them. In late September 2023, Jahanbin filed a motion to compel, which the trial court denied for failing to meet and confer. Jahanbin filed a motion for reconsideration, arguing that the trial court should not have denied his motion to compel when the defendants refused to meet and confer. However, the trial court denied his motion for reconsideration because "[Boeing] reasonably requested that [Jahanbin] identify the alleged deficiencies in their discovery responses prior to a CR 26(i) conference so that [it] could be prepared to meaningfully engage in discussions," but Jahanbin refused, which "indicate[d] that [Jahanbin] did not wish to discuss issues in good faith." And, as Boeing notes, Jahanbin has not appealed the trial court's order denying his motions to compel or reconsider.

Therefore, we conclude that the trial court was within its discretion to deny Jahanbin's CR 56(f) request to continue summary judgment because he failed to show that the evidence would present a genuine issue of fact and that there was good reason for the delay in obtaining it.

---

[12] Under CR 26(i), a court will not consider any discovery motions unless the parties have conferred, including for a motion to compel discovery. A failure to confer will result in CR 37(b) sanctions. CR 26(i)

CONCLUSION

We affirm the trial court's summary judgment dismissal of Jahanbin's claims for disparate treatment and discriminatory discharge under the WLAD and for wrongful discharge in violation of public policy.

_Chung, J._

WE CONCUR:

_____                    _Mann, J._